IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee/Cross-Appellant,*

*v.*

JOEL RANDU ESCALANTE-OROZCO,
*Appellant/Cross-Appellee.*

No. CR-13-0088-AP
Filed January 12, 2017

Appeal from the Superior Court in Maricopa County
The Honorable Warren J. Granville, Judge
No. CR 2007-008288
**AFFIRMED IN PART, REVERSED AND REMANDED IN PART**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, and Jeffrey L. Sparks (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Gregory J. Kuykendall (argued) and Theresa Loken, Kuykendall & Associates, Tucson, Attorneys for Joel Randu Escalante-Orozco

David J. Euchner, Tucson, Attorney for Amicus Curiae Arizona Attorneys for Criminal Justice

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL and BOLICK joined.

JUSTICE TIMMER, opinion of the Court:

¶1 Joel Randu Escalante-Orozco was sentenced to death after a jury found him guilty of first degree murder, sexual assault, and first degree burglary. We have jurisdiction over his automatic appeal and the State's

cross-appeal under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.[1] We affirm Escalante-Orozco's convictions and non-death sentences. To comply with the United States Supreme Court's decision in *Lynch v. Arizona*, 136 S. Ct. 1818 (2016), we vacate the death sentence and remand for a new penalty phase.

**BACKGROUND[2]**

¶2        In March 2001, Escalante-Orozco was employed as a live-in maintenance worker at a Phoenix apartment complex. On March 9, he installed flooring in the apartment that victim Maria R. shared with her three-year-old son.

¶3        Maria's body was found the next morning face down in her bathtub with her nightshirt bunched around her neck. She had been beaten, sexually assaulted, and stabbed until she bled to death. Maria's young son was wandering unharmed in the apartment.

¶4        Escalante-Orozco sold his car and immediately left for Mexico without informing apartment management. Six years later, federal agents detained Escalante-Orozco in Idaho and notified Phoenix Police.

¶5        After waiving his *Miranda*[3] rights, Escalante-Orozco told Phoenix Police officers that he drank two beers on the night of the murder and then "everything went blank" until he found himself lying on Maria in her hallway with his hand on her "private part." He denied putting Maria's body in the bathtub but said he had washed blood off his face and hands. Frightened, he returned to his apartment, showered, gathered important documents, threw his blood-covered clothes into an apartment complex dumpster, and took a bus to Mexico the next day. He denied assaulting or killing Maria and suggested he had been drugged and set up by relatives who were angry with him.

---

[1]        We cite the current versions of statutes unless material changes have been made since Escalante-Orozco committed the offenses.

[2]        We view the facts in the light most favorable to sustaining the jury's verdict. *State v. Gallegos*, 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994).

[3]        *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶6          The State indicted Escalante-Orozco on one count of first
degree murder, two counts of sexual assault, and one count of first degree
burglary and sought the death penalty.  After a prescreening evaluation
revealed that Escalante-Orozco had an intelligence quotient ("IQ") less than
seventy-five, the trial court conducted a twenty-one-day *Atkins*[4] hearing to
determine whether he suffers from an intellectual disability, making him
ineligible for the death penalty.  *See* A.R.S. § 13-753.  The court ultimately
found that Escalante-Orozco did not meet his burden of proving intellectual
disability.

¶7          At trial, the court dismissed one of the sexual assault charges,
and the jury found Escalante-Orozco guilty on all remaining counts.  The
jury found that Escalante-Orozco had murdered Maria in an especially
cruel manner, *see* A.R.S. § 13-751(F)(6), and, after considering mitigation
evidence, determined that he should be sentenced to death.  The court
imposed consecutive sentences of fifteen and twenty years' imprisonment
for the sexual assault and burglary counts, respectively.

## DISCUSSION

### I.      Appeal and cross-appeal

#### A.      Pretrial Issues

##### 1.      Constitutionality of Arizona's framework for determining intellectual disability

¶8          A person with an intellectual disability cannot be sentenced
to death.  A.R.S. § 13-753; *Atkins*, 536 U.S. at 321.  The Supreme Court has
not directed a precise methodology for determining intellectual disability.
*See Bobby v. Bies*, 556 U.S. 825, 830 (2009) ("Our opinion [in *Atkins*] did not
provide definitive procedural or substantive guides for determining when
a person who claims mental retardation 'will be so impaired as to fall
[within *Atkins'* compass].'").  Escalante-Orozco argues that aspects of § 13-
753, which provides Arizona's framework for determining whether a
capital defendant has an intellectual disability, are unconstitutional.  We
review matters of statutory interpretation and constitutional law de novo.

---

4          *Atkins v. Virginia*, 536 U.S. 304 (2002).

*State v. Roque*, 213 Ariz. 193, 217 ¶ 89, 141 P.3d 368, 392 (2006). We presume a statute is constitutional and will construe it to preserve its constitutionality, if possible. *State v. Thompson*, 204 Ariz. 471, 474 ¶ 10, 65 P.3d 420, 423 (2003).

¶9 Before considering Escalante-Orozco's arguments, it is useful to broadly review the framework for determining an intellectual disability. Arizona defines "intellectual disability" as meaning "a condition based on a mental deficit that involves significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive behavior, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen." A.R.S. § 13-753(K)(3). When the state files a notice of intent to seek the death penalty, the court, absent a defendant's objection, must appoint a prescreening psychological expert to determine the defendant's IQ. *Id.* § 13-753(B). If the IQ is higher than seventy-five, the state can continue to seek the death penalty, and no further action is necessary. *Id.* § 13-753(C).

¶10 If the defendant's IQ is seventy-five or less, a more rigorous inquiry is triggered. The court must appoint one or more experts to examine the defendant "using current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures." *Id.* § 13-753(D) — (E). The defendant is then afforded a hearing, where he bears the burden of proving an intellectual disability by clear and convincing evidence. *Id.* § 13-753(G). If the court finds that the defendant has an intellectual disability, it must dismiss the notice of intent to seek the death penalty. *Id.* § 13-753(H). If the defendant fails to prove an intellectual disability, the notice remains in effect. *Id.* The defendant can still introduce evidence of an intellectual disability or diminished mental capacity at the penalty phase of the sentencing proceeding. *Id.*

### (a) IQ score cutoff

¶11 Section 13-753(F) provides that if all the defendant's IQ test scores are above seventy, the court cannot dismiss the notice of intent to seek the death penalty on intellectual disability grounds. Escalante-Orozco argues that this provision violates the Eighth Amendment and article II, section 15 of the Arizona Constitution.

**¶12** Escalante-Orozco's four IQ tests resulted in scores ranging from fifty-eight to seventy-nine, considering adjustments for error. Because some scores were below seventy, § 13-753(F) did not apply, and Escalante-Orozco lacks standing to challenge the statute's constitutionality. *Cf. State v. Reeves*, 233 Ariz. 182, 185 ¶ 10, 310 P.3d 970, 973 (2013) (declining to reach defendant's constitutional challenge to a capital sentencing statute permitting two retrials after a guilty verdict when the defendant was subject to only one retrial); *State v. Powers*, 117 Ariz. 220, 225, 571 P.2d 1016, 1021 (1977) (holding that generally, only a person injured by a statute can challenge its constitutionality).

**¶13** We nevertheless address one of Escalante-Orozco's arguments to provide guidance in other cases. In *Hall v. Florida*, 134 S. Ct. 1986, 2001 (2014), the Supreme Court held that Florida's definition of intellectual disability as requiring an IQ test score of seventy or less, without considering any margin of error, violated the Eighth Amendment. Section 13-753(K)(5) requires courts to consider the margin of error when determining a defendant's IQ. But in *State v. Roque*, this Court stated, without citing any authority, that "the statute accounts for margin of error by requiring multiple tests," and that "[i]f the defendant achieves a full-scale score of 70 or below on any one of the tests, then the court proceeds to a hearing." 213 Ariz. 193, 228 ¶ 150, 141 P.3d 368, 403 (2006) (citation omitted). Escalante-Orozco argues that *Roque*'s view that margin of error is accounted for by conducting multiple tests rather than considering the margin of error for each test makes subsection (F) unconstitutional under *Hall* because it results in a bright-line cutoff.

**¶14** *Roque* incorrectly described § 13-753(K)(5). First, the provision's plain language provides that courts must consider the margin of error for each IQ test, regardless of the number of tests. *See* A.R.S. § 13-753(K)(5) (requiring the court to "take into account the margin of error for the test administered"). This is consistent with established medical practices. *See Hall*, 134 S. Ct. at 1995 ("The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. Each IQ test has a 'standard error of measurement . . . .'" (citation omitted)). Second, if § 13-753(K)(5) is interpreted as *Roque* suggested, § 13-753(F) would violate the Eighth Amendment by setting a full-scale score of seventy as a cutoff without considering the margin of error for each individual test. Our interpretation avoids this unconstitutional result.

¶15        The trial court here considered the margin of error for each IQ score.  Therefore, *Roque*'s mistaken interpretation of § 13-753(K) did not adversely affect Escalante-Orozco.  As occurred in this case, courts should consider the margin of error for each IQ score regardless of the number of tests administered.

### (b)        Definition of adaptive behavior

¶16        Section 13-753(K)(1) defines "adaptive behavior" as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group."  This definition requires an "overall assessment of the defendant's ability to meet society's expectations of him" and differs from a clinical definition, which bases an impairment in adaptive functioning on deficits in at least two life-skill categories without considering strengths.  *See State v. Grell*, 212 Ariz. 516, 529 ¶ 62, 135 P.3d 696, 709 (2006) ("*Grell II*"); *see also State v. Boyston*, 231 Ariz. 539, 547 ¶ 34, 298 P.3d 887, 895 (2013).

¶17        Escalante-Orozco and Amicus argue that Arizona's definition of "adaptive behavior" violates the Eighth Amendment and *Hall* by deviating from the medical definition.  *Hall* noted that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis," although the legal determination "is informed by the medical community's diagnostic framework."  134 S. Ct. at 2000; *see also Kansas v. Crane*, 534 U.S. 407, 413 (2002) ("[T]he science of psychiatry . . . informs but does not control ultimate legal determinations..").  Section 13-753(K)(1) is "similar in overall meaning" to the clinical definition.  *Grell II*, 212 Ariz. at 529 ¶ 62, 135 P.3d at 709.  And the required "overall assessment" permits consideration of deficits in the life-skill categories identified by medical clinicians.  *Id.*  Arizona's failure to precisely align its definition of adaptive behavior with the prevailing medical definition does not violate the Eighth Amendment.  *Cf. Hooks v. Workman*, 689 F.3d 1148, 1172 (10th Cir. 2012) (concluding that a court is not constitutionally required to consider adaptive deficits and ignore strengths); *Ortiz v. United States*, 664 F.3d 1151, 1168–69 (8th Cir. 2011) (noting that while "the mental health community may ignore an individual's strengths when looking at adaptive functioning, presumably as a function of its role in providing support and services to impaired individuals, the law makes a holistic view of an individual,

recognizing that a few reported problems may not negate an inmate's ability to function in other ways" (internal quotes and interlineations omitted)).

### (c) Standard of proof

**¶18** In *Grell II*, this Court concluded that the predecessor to § 13-753(G), which places the burden on a defendant in a pretrial inquiry to prove intellectual disability by clear and convincing evidence, is constitutional. 212 Ariz. at 521–25 ¶¶ 21–41, 135 P.3d at 701–06. Escalante-Orozco and Amicus urge us to revisit that decision, but we decline to do so here. Because the murder took place before August 1, 2002, we independently review whether a preponderance of the evidence establishes an intellectual disability. *See State v. Grell*, 231 Ariz. 153, 155 ¶ 10, 291 P.3d 350, 352 (2013) ("*Grell III*"). Thus, even if we assume that § 13-753(G) is unconstitutional and the pretrial ruling was flawed, it would not make a difference here.

### 2. Failure to hold competency hearing

**¶19** The State asked for a Rule 11 competency evaluation. Three psychologists evaluated Escalante-Orozco, and one found him incompetent to stand trial. The parties stipulated to submit the competency issue to the court based on the expert reports. *See* Ariz. R. Crim. P. 11.5(a) (providing that when a hearing would otherwise be required to determine a defendant's competency, the parties may "by written stipulation, submit the matter on the experts' reports"). The trial court found that Escalante-Orozco was competent to stand trial.

**¶20** Escalante-Orozco argues that the court violated his rights to due process and a fair trial by not holding a competency hearing because one expert report raised more than a "doubt" about his competency. *See State v. Cornell*, 179 Ariz. 314, 322–23, 878 P.2d 1352, 1360–61 (1994) (requiring a hearing when there is a "good faith doubt about the defendant's ability . . . to participate intelligently in the proceedings" (internal quotations omitted)). Escalante-Orozco's stipulation precludes his challenge. *See State v. Pandeli*, 215 Ariz. 514, 528 ¶ 50, 161 P.3d 557, 571 (2007) (discussing the invited error doctrine). Such stipulations are "entirely in accord with due process." *State v. Contreras*, 112 Ariz. 358, 359, 542 P.2d 17, 18 (1975) (citing predecessor statute to Rule 11.5(a)); *see also State v. Bates*, 111 Ariz. 202, 203, 526 P.2d 1054, 1055 (1974) (concluding trial

court did not err by failing to hold a competency hearing because the parties stipulated to submit the issue to the court based on expert reports).

### 3.    Motion to suppress statements to police

**¶21**    Escalante-Orozco argues that statements he made to Phoenix Police Detective Julio Caraballo in a videotaped interview in Idaho were inadmissible because (a) the detective did not properly advise Escalante-Orozco of his *Miranda* rights, and (b) officers violated Article 36 of the Vienna Convention on Consular Relations ("VCCR").  We review a trial court's denial of a motion to suppress for an abuse of discretion, considering only evidence admitted at the suppression hearing and viewing it in the light most favorable to sustaining the ruling.  *State v. Wilson*, 237 Ariz. 296, 298 ¶ 7, 350 P.3d 800, 802 (2015).  Constitutional issues, however, are reviewed de novo.  *State v. Moody*, 208 Ariz. 424, 445 ¶ 62, 94 P.3d 1119, 1140 (2004).

### (a)    *Miranda* **warnings**

### (1)    Use of "licenciado"

**¶22**    Detective Caraballo read Escalante-Orozco his *Miranda* rights from a Spanish-language form that accurately translated "attorney" as "abogado."  When asked, Escalante-Orozco replied he understood his rights.  Detective Caraballo nevertheless questioned Escalante-Orozco about the role of an attorney to ensure he understood it.  In doing so, the detective once translated "attorney" as "licenciado."  Escalante-Orozco argues that he did not properly waive his *Miranda* rights because Detective Caraballo's use of "licenciado" was confusing and inadequately conveyed the right to have an attorney present before and during questioning.

**¶23**    The trial court found that although "licenciado" primarily means a university graduate and, secondarily, a lawyer, and Escalante-Orozco "appeared confused" on the videotape by the words, the totality of the circumstances demonstrated that the *Miranda* warnings were adequate.  *See State v. Rivera*, 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987) (holding that to determine adequacy of warnings, court looks to the totality of the circumstances, including a defendant's "background, experience and conduct" (citation omitted)).  The court did not err.

¶24 Detective Caraballo's single use of "licenciado" was neither misleading nor inaccurate. *Cf. United States v. Botello-Rosales*, 728 F.3d 865, 867 (9th Cir. 2013) (use of the Spanish word "libre" to indicate an attorney would be "free" or without cost rendered *Miranda* warnings inadequate because "libre" means being available or at liberty to do something); *United States. v. Perez-Lopez*, 348 F.3d 839, 848–49 (9th Cir. 2003) (Spanish-language *Miranda* warning that the defendant had the right to "solicit" the court for an attorney found "constitutionally infirm because it did not convey to him the government's obligation to appoint an attorney for indigent accused"). "Licenciado" is a synonym for "abogado." *See* Merriam-Webster Online Spanish-English Dictionary, http://www.spanishcentral.com/ translate/licenciado (last visited Nov. 10, 2016). Even if Escalante-Orozco was not familiar with the term, the detective used it only once and used "abogado" several times. And Escalante-Orozco stated that he understood his rights before the detective used the word "licenciado." Any confusion encountered by Escalante-Orozco was further minimized because a federal agent had given *Miranda* warnings the previous day and used the word "abogado."

### (2) Description of attorney's role

¶25 Detective Caraballo described an attorney as someone who could represent Escalante-Orozco "in front of the court," "in front of the jury," and "in front of the case that is in front [sic]." Escalante-Orozco contends that this description was misleading, confusing, and nonsensical and incorrectly implied that he would only be provided an attorney at court. Escalante-Orozco also argues that the initial, accurate advisory did not cure the error because he had a fundamental misunderstanding of the role of an attorney that was only made worse by Detective Caraballo's use of "licenciado."

¶26 The trial court did not err in its ruling. The detective accurately informed Escalante-Orozco that he had "the right to have an attorney present before and during the questions if [he] desire[d]," and told him that an attorney would be appointed for him if he could not afford one. Escalante-Orozco stated that he understood these rights. The detective's subsequent description of an attorney was not inconsistent with the advisory given and, in context, was reasonably viewed as a general description of an attorney's role rather than a repudiation of the just-explained right to have that person present before and during questioning.

*Cf. Duckworth v. Egan*, 492 U.S. 195, 203–05 (1989) (telling a suspect he would be appointed an attorney "if and when [he went] to court" did not render *Miranda* warning inadequate because officer initially conveyed that defendant had a right to counsel before the police asked him questions and could stop answering any time to talk to an attorney); *California v. Prysock*, 453 U.S. 355, 360–62 (1981) (failing to explicitly state that counsel would be appointed before questioning did not invalidate a *Miranda* advisory when suspect was informed of his right to have an attorney present during questioning and his right to counsel appointed at no cost). Escalante-Orozco also demonstrated an understanding that he could immediately confer with an attorney by stating that an attorney was someone "to see . . . why you guys have me here" and "to ask you why I'm here."

### (3)    Waiver

**¶27**        Escalante-Orozco argues that the State failed to prove that he knowingly and intelligently waived his *Miranda* rights because he suffered from an intellectual disability, was poorly acculturated, and had limited knowledge of the American legal system.

**¶28**        Escalante-Orozco's waiver was knowing and intelligent if he understood his rights and intended to waive them. *See State v. Naranjo*, 234 Ariz. 233, 238 ¶ 7, 321 P.3d 398, 403 (2014). To determine the validity of a waiver, courts examine the totality of circumstances, "including the defendant's background, experience, and conduct," to decide the validity of the waiver. *Id.* (citation omitted). Mental illness, low intelligence, or poor linguistic abilities, standing alone, do not invalidate an otherwise knowing and intelligent waiver. *See id.* at 238 ¶ 8; *State v. Carrillo*, 156 Ariz. 125, 134, 750 P.2d 883, 892 (1988).

**¶29**        The suppression hearing record supports the trial court's ruling that Escalante-Orozco knowingly and intelligently waived his *Miranda* rights. He was interviewed in Spanish, he was twice read his rights in Spanish, he indicated he understood his rights, and he freely answered all questions. From the videotape, he appears to respond appropriately to questions. Detective Caraballo testified that he "had no doubt that [Escalante-Orozco] . . . understood his rights." Although medical expert Dr. Francisco Gomez opined that Escalante-Orozco did not understand his *Miranda* rights, the trial court was free to disregard this opinion. *Cf. State v. Hyde*, 186 Ariz. 252, 276, 921 P.2d 655, 679 (1996) (concluding that expert

psychological testimony is "not appropriate . . . to show the actual mental state of a defendant at a given time").

### (b) The VCCR

**¶30** Escalante-Orozco argues that officers violated Article 36 of the VCCR and, as part of the totality of the circumstances, this violation prevented him from making a knowing and intelligent waiver of his *Miranda* rights. Article 36 requires authorities to advise a foreign national detainee "without delay" of the detainee's right to request that the consulate be advised of the detention. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338–39 (2006). Authorities informed Escalante-Orozco of this right on May 3, 2007, the day after federal agents detained him and Detective Caraballo interrogated him. The record does not reflect whether Escalante-Orozco asked authorities to notify the Mexican consulate of his detention, but they did so a week after the arrest.

**¶31** We need not decide whether authorities violated the VCCR. The remedy for a violation of Article 36 of the VCCR is not suppression of a foreign national's otherwise admissible statements. *Sanchez-Llamas*, 548 U.S. at 349–50. And even if we assume that Escalante-Orozco would have exercised his consular rights if he had been informed of them before his interrogation, Detective Caraballo was entitled to proceed with the interrogation when he did. *See id.* at 349 (stating that Article 36 "has nothing whatsoever to do with . . . interrogations" and "secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention"); *see also* Consular Notification and Access 21 (4th ed. 2014).

**¶32** Escalante-Orozco nevertheless argues that a VCCR violation is relevant in determining whether a *Miranda* waiver was knowing and intelligent, and the trial court erred by failing to consider that violation as part of the totality of the circumstances. He relies on *Sanchez-Llamas'* statement that "[a] defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police." 548 U.S. at 350. But *Miranda* violations and voluntariness are separate inquiries. *Compare State v. Tapia*, 159 Ariz. 284, 286, 767 P.2d 5, 7 (1988) ("The necessity of giving *Miranda* warnings relates to the admissibility of a confession based upon defendant's being apprised of his right to counsel and waiving that

right and not to its voluntariness."), *with In re Andre M.*, 207 Ariz. 482, 484 ¶ 7, 88 P.3d 552, 554 (2004) (noting that voluntariness concerns whether a statement was given as a result of intimidation, coercion, or deception). While a violation of the VCCR might bear on whether a defendant was intimidated or coerced, it would have no bearing on whether the defendant had been apprised of his right to counsel and made a knowing and voluntary waiver.

### B.     Jury selection issues

### 1.     Time limits

**¶33**        Escalante-Orozco argues that the trial court erred by imposing a five-minute time limit for counsel's questions to individual prospective jurors, which impaired his right to a fair and impartial jury under the state and federal constitutions. To prevail on his argument, Escalante-Orozco must "demonstrate not only that the voir dire examination was inadequate, but also that, as a result of the inadequate questioning, the jury selected was not fair, unbiased, and impartial." *See Moody*, 208 Ariz. at 451 ¶ 95, 94 P.3d at 1146. We review the court's decision to impose the time limit for an abuse of discretion. *See State v. Forde*, 233 Ariz. 543, 560 ¶ 53, 315 P.3d 1200, 1217 (2014).

**¶34**        We reject Escalante-Orozco's argument. The trial court is authorized to "control the voir dire" but must permit a party, upon request, to examine jurors for "a reasonable time." Ariz. R. Crim. P. 18.5(d). Even if the time afforded was insufficient, Escalante-Orozco fails to demonstrate that the jury seated was not fair, unbiased, and impartial. *See Moody*, 208 Ariz. at 451 ¶ 95, 94 P.3d at 1146. The parties questioned jurors over the course of five trial days. And despite the five-minute time limit, the court posed appropriate follow-up questions to jurors beyond the time limit to ensure that jurors were unbiased.

### 2.     *Batson* challenges

**¶35**        Escalante-Orozco challenges the State's preemptory strikes of Jurors 17, 36, 61, 71, and 88, all of whom are racial minorities. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that the use of preemptory strikes to exclude jurors based on their race violates the Fourteenth Amendment's Equal Protection Clause). A trial court uses a three-step analysis to decide

a *Batson* challenge. *State v. Newell*, 212 Ariz. 389, 400 ¶ 53, 132 P.3d 833, 844 (2006). The defendant initially must make a prima facie showing that the strike was racially discriminatory. *Id.* If this showing is made, the prosecutor must provide a race-neutral rationale for the strike. *Id.* If the prosecutor provides this rationale, the trial court must decide whether "the defendant has established purposeful discrimination." *Id.* (quoting *Batson*, 476 U.S at 93–94). We will uphold the court's ruling unless it was clearly erroneous. *Id.* at 400 ¶ 52, 132 P.3d at 844.

¶36 The trial court's ruling was not clearly erroneous. The prosecutor offered a race-neutral rationale by explaining that he struck the contested jurors because their questionnaire answers indicated either opposition to the death penalty or potential reluctance in imposing the death penalty if warranted. He also cited Juror 36's answer that graphic and disturbing photographs would make it difficult for him to be fair and impartial. He further expressed concern that Juror 71's job as a high school teacher could influence her. (The prosecutor also stated that Juror 71 was inattentive, but the court did not share this observation so made "no finding of that.") The questionnaire answers bear out the prosecutor's factual assertions, and we defer to the trial court's assessment of the prosecutor's credibility in explaining his strikes. *Cf. State v. Hardy*, 230 Ariz. 281, 285 ¶ 12, 283 P.3d 12, 16 (2012) (stating that "the trial court evaluates the striking party's credibility, considering the demeanor of the striking attorney and the excluded juror to determine whether the race-neutral rationale is a pretext for discrimination"). And one minority juror remained on the jury. *Cf. id.* ("Although not dispositive, the fact that the state accepted other minority jurors on the venire is indicative of a nondiscriminatory motive." (citation omitted)).

¶37 Escalante-Orozco faults the trial court for failing to "conduct a cross-comparison analysis of the struck and non-struck jurors." *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be consider at *Batson*'s third step."). But Escalante-Orozco failed to raise this argument to the trial court, meaning "the prosecutor had no opportunity to offer distinctions between allegedly similarly situated jurors or to clarify which factors were given more weight in the choice to strike," and "the trial court did not have an opportunity to conduct an in-depth comparison of the jurors who were stricken and those

who remained on the panel." *See State v. Medina*, 232 Ariz. 391, 405 ¶ 49, 306 P.3d 48, 62 (2013). Defense counsel offered no counter to the prosecutor's explanations other than to contend that the prosecutor had failed to prove race-neutral reasons for his strikes and that Juror 36's aversion to graphic photographs was not unique. We will not examine more detailed comparisons than were presented to the trial court. *Id.*

### 3. Hardship recusals

¶38 Escalante-Orozco contends that the trial court's act in granting five potential jurors' requests for recusal due to their limited English language skills resulted in a systemic exclusion of non-English speakers from jury service in violation of the federal and state constitutions. We disagree. Section 21-202(B)(3) requires the trial court to grant a person's recusal request if "[t]he prospective juror is not currently capable of understanding the English language." *See also State v. Morris*, 215 Ariz. 324, 334 ¶ 42, 160 P.3d 203, 213 (2007) (holding that judges have broad discretion to excuse jurors from service). For reasons explained in previous cases, § 21-202(B)(3) does not violate a defendant's constitutional rights. *See State v. Rose*, 231 Ariz. 500, 504–05 ¶ 11, 297 P.3d 906, 910–11 (2013); *State v. Cota*, 229 Ariz. 136, 143 ¶¶ 13–16, 272 P.3d 1027, 1034 (2012); *State v. Cordova*, 109 Ariz. 439, 441, 511 P.2d 621, 623 (1973); *see also Duren v. Missouri*, 439 U.S. 357, 367–68 (1979) (holding that the Constitution is not violated if "a significant state interest" is "manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group"). We decline to revisit those holdings.

### 4. Juror 92

¶39 Escalante-Orozco contends that the trial court violated his right to a fair and impartial jury under the federal and state constitutions by failing to sua sponte excuse Juror 92, an office assistant employed by the Maricopa County Medical Examiner's Office. He argues that Juror 92 likely knew both Dr. Marco Ross, a witness who was formerly employed by the Medical Examiner's Office, and the author (who was not identified) of a report on which Dr. Ross relied that originated from that office.

¶40 Because Escalante-Orozco did not object to seating Juror 92, we review for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005). A fundamental error is error that goes to the

foundation of the case, takes from the defendant a right that is essential to his defense, and is of such magnitude that the defendant could not possibly have received a fair trial. *Id.* Escalante-Orozco bears the burden of proving that the error was fundamental and that the error prejudiced him. *Id.*

**¶41** Section 21-211 requires disqualification of "[p]ersons interested directly or indirectly in the matter under investigation." The record does not reflect that Juror 92 had such an interest. Juror 92 did not indicate in the jury questionnaire that she knew Dr. Ross, and Escalante-Orozco did not question her about it. He speculates that it was "likely" that Dr. Ross and Juror 92 had contact and that she "may have known" the unknown author of the medical examiner's report, but the record does not establish this likelihood. Juror 92's position as an office assistant does not suggest that she had contact with Dr. Ross or the unknown report author. And because Dr. Ross left the medical examiner's office, at the latest, in 2002 and Juror 92 started there in 2010, we know they did not simultaneously work there. Significantly, Juror 92 said she could treat the case fairly and impartially despite her work at the medical examiner's office.

**¶42** This case is unlike *State v. Eddington*, 228 Ariz. 361, 364 ¶¶ 11–13, 266 P.3d 1057, 1060 (2011), in which a deputy sheriff employed by the law enforcement agency that investigated the crime was disqualified from sitting on the jury because he was potentially interested in the outcome of the case. This Court reasoned that disqualification was warranted because the sheriff's office and the prosecutor shared an interest in "advocating for a conviction." *Id.* at 364 ¶ 11, 266 P.3d at 1060. A medical examiner's office, however, does not share such an interest with the prosecution.

**¶43** The trial court did not commit fundamental error by failing to sua sponte disqualify Juror 92.

### C. Guilt Phase Issues

### 1. DNA Evidence

### (a) Motion to suppress

**¶44** Escalante-Orozco argues that the trial court erred by denying his motion to preclude DNA evidence. We review the court's ruling for an abuse of discretion, considering only evidence admitted at the suppression

hearing and viewing it in the light most favorable to sustaining the ruling. *Wilson*, 237 Ariz. at 298 ¶ 7, 350 P.3d at 802.

### (1)    Sperm fraction from Maria's nightshirt

¶45        Phoenix Police Department Crime Lab analyst Kathleen Stoller obtained a mixed Y-STR profile from sperm on Maria's nightshirt, with the major part matching an unknown male and the minor part "matching" Escalante-Orozco's DNA profile at five loci (specific locations of genes on chromosomes).  (A Y-STR profile is one that excludes a female DNA profile.)  She testified at the suppression hearing that the same Y-STR profile would be expected in all Escalante-Orozco's paternal relatives and in one in thirty-four southwestern Hispanics.

¶46        Escalante-Orozco argues that Stoller's opinions were unreliable and therefore inadmissible because she relied on a "match" at one locus that fell below the threshold for identifying an allele set by the police department's protocol guidelines.  *See* Ariz. R. Evid. 702 (providing that admissible expert opinion must be "the product of reliable principles and methods").  He points out that Stoller obtained below-threshold results for other alleles that she did not use for statistical purposes, casting further doubt on her reliance on one below-threshold allele.

¶47        The State demonstrated that Stoller's DNA interpretation technique was sufficiently reliable.  She testified that the guidelines permitted her to use the below-threshold allele for statistical purposes because its measurement was greater than three times the "baseline noise" in the graph generated by the device used to analyze genetic material.  Her testimony was corroborated by the Department's protocol guidelines.  And the widely accepted Scientific Working Group on DNA Analysis Methods ("SWGDAM") Guidelines acknowledge that the threshold is malleable.

¶48        Escalante-Orozco further contends that Evidence Rule 403 required suppression because the Y-STR profile would be expected in one in thirty-four southwestern Hispanics, meaning its probative value was substantially outweighed by the danger of unfair prejudice or misleading the jury.  Unfair prejudice is an "undue tendency to suggest decision on an improper basis, such as emotion, sympathy or horror."  *State v. Mott*, 187 Ariz. 536, 545, 931 P.2d 1046, 1055 (1997).  The DNA evidence does not fall within this category.  And the evidence was not misleading.  Stoller testified

that the Y-STR profile could be found in others, and the jury could readily understand this limitation and give the evidence whatever weight it deserved.

### (2) "Included," "not excluded," and "match"

**¶49** Escalante-Orozco argues that the trial court erred by denying his pretrial motion to preclude Stoller from using the words "included" and "not excluded" interchangeably in relation to DNA evidence because it would mislead and confuse the jury. We disagree. Stoller testified at a pretrial hearing that "included" and "not excluded" mean the same thing. The court did not abuse its discretion by crediting this testimony. This case is unlike *Duncan v. Kentucky*, 322 S.W.3d 81 (Ky. 2010), relied on by Escalante-Orozco, in which the Kentucky Supreme Court reversed convictions in part because the prosecutor mischaracterized an expert's testimony that the defendant could not be excluded as a source of DNA found in the victim's panties as meaning that the defendant was the source of that DNA. *Id.* at 91–92. That did not occur here.

**¶50** We also reject Escalante-Orozco's argument that the court erred by permitting Stoller to use the word "match" to describe DNA profiles consistent with his because it was likely to mislead jurors to believe he was the source of the profile rather than a possible source. Stoller explained at trial that her use of the word "match" did not mean that the DNA could only have belonged to Escalante-Orozco.

### (b) Trial

**¶51** We review the trial court's evidentiary rulings for an abuse of discretion. *See State v. Blakley*, 204 Ariz. 429, 437 ¶ 34, 65 P.3d 77, 85 (2003). We review arguments raised for the first time on appeal, however, for fundamental error. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

### (1) Demonstrative chart

**¶52** Stoller testified that swabs of Maria's vagina contained a non-sperm fraction with a mixed Y-STR profile, the major part of which matched Escalante-Orozco's profile at ten of seventeen loci. In response to defense criticism that Stoller based her opinion on only one locus, the trial court

17

permitted the State to display a demonstrative chart depicting Stoller's interpretive findings while she explained her opinion.

**¶53**　　　Escalante-Orozco argues that the trial court erred by permitting the State to use the chart because it depicted six alleles with below-threshold values and was therefore unreliable under Rule 702 and violated Rule 403. We disagree. The State did not use the chart to argue that the below-threshold alleles provided reliable data points or evidenced a "match" between those locations and Escalante-Orozco's profile. Indeed, Stoller relied on the ten above-threshold loci and explicitly stated that the below-threshold alleles were not reliable and "too weak to be sure that they are even real." Any possible undue prejudice that may have resulted was resolved by Stoller's explanation.

### (2)　Exhibit 220

**¶54**　　　Stoller performed a Y-STR analysis on Maria's right fingernail clippings. Without objection, the trial court admitted as Exhibit 220 a chart prepared by Stoller comparing Escalante-Orozco's Y chromosomes with the unknown male's Y chromosomes taken from the vaginal swab and the right fingernail clippings. Escalante-Orozco argues for the first time that the court violated Rules 403 and 702 by admitting Exhibit 220 because it permitted the jury to mistakenly conclude that Escalante-Orozco's Y chromosomes matched the clippings at sixteen loci rather than at fifteen loci. We review for fundamental error.

**¶55**　　　The court did not err. Exhibit 220 shows allelic values at fifteen loci with an additional loci yielding no results. And immediately before presenting the chart, Stoller testified that she "was able to obtain results at 15 out of the 17 locations." Exhibit 220 did not permit the jury to falsely conclude that clippings yielded a match at sixteen loci.

### (3)　Admission of Y-STR DNA evidence

**¶56**　　　Escalante-Orozco argues for the first time that the trial court violated Rules 403 and 702 by admitting Y-STR DNA evidence. We review for fundamental error.

**¶57**　　　Escalante-Orozco contends that the Y-STR evidence has such low probative value that it did not satisfy Rule 702's "helpfulness"

requirement. Rule 702's requirement that evidence be "helpful" to the trier of fact "goes primarily to relevance." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). To be helpful, evidence must be related to a fact at issue in the case and "fit" the facts of the case. *Id.*; *see also State v. Salazar-Mercado*, 234 Ariz. 590, 593 ¶ 10 n.1, 325 P.3d 996, 999 n.1 (2014) ("Expert testimony 'fits' if it is sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." (internal quotation marks and citation omitted)). In other words, the testimony must have "a valid scientific connection to the pertinent inquiry" to be admissible. *Daubert*, 509 U.S. at 591. Escalante-Orozco argues that the Y-STR results did not meet this requirement because the strongest inference the jury could have drawn was that he was "*possibly* the DNA source."

¶**58** The Y-STR results were helpful to the jury. The results were related to a disputed issue—whether Escalante-Orozco was the perpetrator—because the fact he could not be excluded tended to make it more likely that he sexually assaulted and killed Maria than if the Y-STR results had excluded him. Although the Y-STR results could be attributed to a statistically significant percentage of the general population, this circumstance does not diminish or eliminate the fact that Escalante-Orozco was among that group. Therefore, the Y-STR DNA evidence was probative of the issue of guilt and met Rule 702's requirement that evidence be "helpful" to the trier of fact.

¶**59** Escalante-Orozco also argues that because the Y-STR evidence has only "marginal statistical significance," it should have been excluded under Rule 403 because it was confusing to the jury. We disagree. As explained, the Y-STR evidence was probative of whether Escalante-Orozco sexually assaulted and killed Maria. When presenting the Y-STR results to the jury, Stoller extensively explained the statistics regarding the number of people who would also match the profile, and she explained that the results meant only that Escalante-Orozco could not be excluded. The jury could understand the limited probative value of the DNA evidence without danger of confusion.

### (4) Major contributor

¶**60** Swabs taken of Maria's vagina and external genitals yielded non-sperm fractions with mixed Y-STR profiles. Stoller testified that the "major part" of the profiles matched Escalante-Orozco's. He contends that

this conclusion was not scientifically valid as required by Rule 702 and *Daubert* because it was based on the relative strengths of alleles at a single locus. We review for fundamental error.

**¶61** The trial court did not err. The SWGDAM Guidelines state that "all loci should be evaluated" when interpreting mixtures with major/minor male contributors, and that "[a] sample may be considered to consist of a mixture of major and minor male contributors if a distinct contrast in signal intensity exists among the alleles." Stoller complied with these guidelines. She evaluated all loci and concluded that Escalante-Orozco was the major contributor because the allele consistent with his profile was four times larger than one at the same locus belonging to an unknown male. Although the defense expert witness criticized identifying the major contributor based on information at only one locus, the jury could decide whose opinion to credit.

## 2. Third-party culpability evidence

**¶62** Escalante-Orozco argues that the trial court incorrectly precluded evidence that Armando Gabriel Lopez-Garduno, Maria's boyfriend, assaulted and killed Maria. Escalante-Orozco also contends that the court erroneously instructed the jury about third-party culpability. He asserts that the errors violated his right to present a complete defense and his rights to a fair trial under the state and federal constitutions. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (stating that preclusion of third-party culpability evidence bearing "persuasive assurances of trustworthiness" deprives a defendant of due process). We review the admissibility of evidence and the decision to give a jury instruction for an abuse of discretion. *State v. Dann*, 220 Ariz. 351, 363–64 ¶ 51, 207 P.3d 604, 616–17 (2009); *State v. Prion*, 203 Ariz. 157, 161 ¶ 21, 52 P.3d 189, 193 (2002).

### (a) Rocio Ugalde's testimony

**¶63** Escalante-Orozco sought to elicit testimony from Rocio Ugalde that Maria had told her that Lopez-Garduno bruised Maria's arm and that he was violent with his wife. The trial court precluded the testimony as inadmissible hearsay and pursuant to Rule 403.

**¶64** Rule 807(a)(1), the residual exception to the hearsay rule, permits admission of hearsay statements that have "equivalent

20

circumstantial guarantees of trustworthiness" to firmly rooted exceptions. Escalante-Orozco argues that Ugalde's anticipated testimony was corroborated by other evidence and was "at least as reliable" as a statement against interest (Rule 804(b)(3)) or a statement by an opposing party (Rule 801(d)(2)). We disagree. Neither statement by Maria was against her own interest. And we cannot say that the statements were against Lopez-Garduno's interest. Contrary to Escalante-Orozco's unsupported assertion, nothing in the record suggests that Maria learned from Lopez-Garduno that he was violent with his wife.

¶65        We reject Escalante-Orozco's argument that the statement about the bruise was trustworthy because it is similar to a statement of then-existing mental, emotional, or physical condition (Rule 803(3)) or a statement for medical diagnosis or treatment (Rule 803(4)). Without knowing the circumstances under which Maria made this statement, we cannot discern how it bears similar indicia of reliability.

¶66        Escalante-Orozco also contends that Ugalde's testimony was not hearsay to the extent it was used to show the inadequacy of the police investigation. *See State v. Dunlap*, 187 Ariz. 441, 457, 930 P.2d 518, 534 (1997) ("[B]ecause [the] defendant elicited [a statement] to show the inadequacy of the investigation, and did not offer it for the truth of the matter asserted, it was not hearsay."). But nothing suggests that Ugalde told police about Maria's statements, which arguably should have prompted a more diligent investigation of Lopez-Garduno. Regardless, any error was harmless as Ugalde testified that she named Lopez-Garduno as a suspect to the police, and they followed up by interviewing him.

¶67        The trial court did not abuse its discretion by precluding the contested testimony as hearsay. In light of this conclusion, we need not address whether the court properly precluded the evidence under Rule 403.

### (b)    Blanca Cisneros' testimony

¶68        Escalante-Orozco sought to elicit testimony from Blanca Cisneros that her husband, Lopez-Garduno, was a mean drunk, resisted efforts to get help for alcoholism, lied about attending Alcoholics Anonymous, hit her on two occasions, and that their relationship deteriorated because of his drinking. The trial court precluded all Cisneros's testimony under Rule 403.

¶**69**     The court did not abuse its discretion. The admissibility of third-party culpability evidence is governed by Rules 401 to 403. *State v. Machado*, 226 Ariz. 281, 284 ¶ 16, 246 P.3d 632, 635 (2011). The evidence must have an effect on the defendant's culpability and need only "*tend*[] to create a reasonable doubt as to the defendant's guilt." *Id.* at 285 ¶ 24, 246 P.3d at 636 (citation omitted). The trial court did not err in ruling that Cisneros's anticipated testimony had scant probative weight and was substantially outweighed by the danger of confusing or misleading the jury. *See* Ariz. R. Evid. 403. The evidence had nothing to do with Lopez-Garduno's relationship with Maria and did not tend to create a reasonable doubt about Escalante Orozco's guilt. The jury would have had to speculate to find otherwise. *Cf. State v. Dann*, 205 Ariz. 557, 569 ¶ 36, 74 P.3d 231, 243 (2003) (concluding no error to exclude under Rule 403 evidence of third-party culpability founded on mere suspicion or speculation).

### (c)     Lopez-Garduno's statements

¶**70**     Lopez-Garduno could not be located at the time of trial. The trial court permitted Escalante-Orozco to introduce his statements to police by eliciting testimony from Detective Jose Cisneros. The court reasoned that the statements were not hearsay because they were offered to show that Lopez-Garduno gave inconsistent statements to police, which was relevant to the adequacy of the investigation. At the State's request, the court also admitted a transcript of the detective's complete interview with Lopez-Garduno. The court instructed the jury that Lopez-Garduno's statements related to the scope of the police investigation and could not be used to prove the truth of the statements.

¶**71**     Escalante-Orozco contends that Lopez-Garduno's statements that he and Maria had fought several days before her death and that he had been "bad" to his wife were admissible without limitation as the statements were either not hearsay or admissible as a hearsay exception. We disagree. Rule 801(d)(2)(A), which provides that an opposing party's statements are not hearsay, did not apply because Lopez-Garduno was not a party. Rule 804(b)(3), which offers a hearsay exception if the statement has a tendency to expose the declarant to criminal liability, did not apply because the statements were vague and did not implicate criminal behavior. Rule 807, the residual exception, did not apply because Lopez-Garduno's statements did not have "equivalent circumstantial guarantees of trustworthiness" as established hearsay exceptions.

22

¶72 The trial court sustained the State's objection to permitting Detective Cisneros to read the portion of Lopez-Garduno's interview transcript in which he admitted he was "bad" to his wife. Escalante-Orozco incorrectly contends that the court excluded the evidence under Rule 404. Although the court characterized Lopez-Garduno's statement as describing "[h]is prior bad 404 acts," the court's ruling rested on relevancy. The court did not abuse its discretion. Lopez-Garduno's statement that he was "bad" to his wife was vague and did not tend to suggest that the police investigation was inadequate. *Cf.* Ariz. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence.").

### (d) The March 9, 2001 police report

¶73 On March 9, 2001, the night before Maria's murder, a Hispanic man purportedly peeked through the blinds at another apartment in Maria's complex and threatened to kill a woman inside. The trial court precluded admission of the police report documenting the event under Rules 402 and 403 and Arizona Rule of Criminal Procedure 15.2.

¶74 Escalante-Orozco contends that the report tended to create a reasonable doubt about his guilt and was therefore relevant and admissible because (1) the apartment was located on the ground floor of a building directly behind Maria's building; (2) Maria's front-window screen had been removed and the window was open when her body was found; and (3) Lopez-Garduno was Hispanic.

¶75 The trial court did not err. Escalante-Orozco never disclosed a defense that someone other than Lopez-Garduno was the perpetrator. *See* Ariz. R. Crim. P. 15.2(b) (requiring pretrial disclosure of defenses). His defense was that Lopez-Garduno committed the crimes in the course of his relationship with Maria, not that he randomly committed such acts against women. Nothing tied Lopez-Garduno to the crime committed against the other woman.

### 3. Character and other-act evidence

### (a) Robert Anderson's testimony

23

¶76         Escalante-Orozco installed flooring in Maria's apartment the day before the murder. Robert Anderson, Escalante-Orozco's supervisor, testified he observed Escalante-Orozco speaking to Maria in Spanish inside her apartment while making "pleading" motions with his hands. Maria gave Anderson a "funny look" that he interpreted as her requesting that he get Escalante-Orozco to leave, and he did so. Although Anderson did not understand Spanish, he believed Escalante-Orozco was not speaking in a "normal tone." When Escalante-Orozco went to pick up his paycheck later that day, he seemed "agitated," "wasn't himself," and "kept looking up" at Maria's apartment. The trial court admitted this evidence as permissible other-act evidence.

¶77         Evidence of a defendant's "other crimes, wrongs, or acts" generally cannot be introduced to prove that the defendant acted the same way on another occasion, but it can be used for other purposes, such as proof of motive or identity. Ariz. R. Evid. 404(b). Before admitting such evidence, the court must find (1) clear and convincing proof that the defendant committed the act; (2) it is offered for a proper purpose under Rule 404(b); (3) it is relevant to prove that purpose; and (4) its probative value is not substantially outweighed by the danger of unfair prejudice. *State v. Anthony*, 218 Ariz. 439, 444 ¶ 33, 189 P.3d 366, 371 (2008). If the court admits the evidence, it must give an appropriate limiting instruction, if requested. *Id.*

¶78         Contrary to Escalante-Orozco's argument, the State demonstrated that he committed the other acts by clear and convincing evidence. Anderson testified during the *Atkins* hearing about his observations, and the trial court was able to assess his credibility. Whether Anderson understood Spanish and accurately surmised the tone of Escalante-Orozco's words and Maria's reaction to them had no bearing on whether Escalante-Orozco committed the other acts.

¶79         The trial court did not abuse its discretion by admitting Anderson's testimony as proof of motive. This Court has "long held that where the existence of premeditation is in issue, evidence of previous quarrels or difficulties between the accused and the victim is admissible." *State v. Jeffers*, 135 Ariz. 404, 418, 661 P.2d 1105, 1119 (1983) (citing *Leonard v. State*, 17 Ariz. 293, 151 P. 947 (1915)). Such evidence "tends to show the malice, motive or premeditation of the accused." *Id.* Anderson's observations suggested that Escalante-Orozco was upset with Maria the

day before her murder, which evidenced a motive for committing the crimes.

¶80        The trial court did not err in finding that the probative value of the other-act evidence was not substantially outweighed by the danger of unfair prejudice.  The evidence was not unfairly prejudicial.  It did not suggest a decision based on an improper basis "such as emotion, sympathy or horror."  *See Mott*, 187 Ariz. at 545, 931 P.2d at 1055.  And we fail to see how the evidence confused the issues as it related to a motive for the crimes committed against Maria.  The jury was capable of deciding what weight to give Anderson's testimony in light of his inability to understand Spanish and the jury's assessment of Anderson's powers of observation.

¶81        The trial court did not err by allowing the other-act evidence as proof of motive.  We need not address the trial court's alternate bases for admitting the evidence.

### (b)    Cecilia Banda's testimony

¶82        On cross-examination by defense counsel, Cecilia Banda, Escalante-Orozco's wife at the time of the murder, testified that Maria came by the couple's apartment once when both were home.  When asked if she noticed that Escalante-Orozco looked at Maria, Banda answered, "[h]e looked at a lot of them."  When asked to clarify this answer on redirect, Banda replied, "[h]e's one of those kind of people that was like a flirt, I don't know how to explain it."  Escalante-Orozco argues for the first time that Banda's testimony was inadmissible character evidence.  *See* Ariz. R. Evid. 404(a).  We review for fundamental error.  *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶83        Even assuming that the evidence was inadmissible character evidence, Escalante-Orozco has not shown fundamental, prejudicial error.  His defense theory was Lopez-Garduno committed the crimes.  Escalante-Orozco theorized at trial that Maria "was interested in him" and he went to her apartment before the murder seeking companionship.  Lopez-Garduno caught them together and raped and killed Maria and knocked out Escalante-Orozco in a jealous rage.  To support this theory, defense counsel used Banda's testimony to argue that Escalante-Orzoco was a "flirt" and "seemed to be interested in Maria."  In light of Escalante-Orozco's use of

the challenged testimony, we cannot fathom how its admission took away a right essential to his defense or deprived him of a fair trial. *See id.*

### 4. Photographs

**¶84** The trial court, without objection, admitted into evidence nineteen autopsy photographs and six crime scene photographs depicting Maria's body. Escalante-Orozco now argues that the photographs were needlessly cumulative and introduced solely to inflame the jury in violation of Rule 403 and violated the constitutional guarantees of due process and a fair trial. *See State v. Anderson*, 210 Ariz. 327, 340 ¶ 40, 111 P.3d 369, 382 (2005) (stating that photographs must not be introduced "for the sole purpose of inflaming the jury" (quoting *State v. Gerlaugh*, 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982))). We review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

**¶85** The trial court did not commit error, much less fundamental error. The autopsy photographs were not cumulative because the medical examiner used each one to explain a different aspect of his testimony. The photographs established the number and severity of Maria's injuries, the defensive nature of some wounds, and that she suffered vaginal injuries. *Cf. Anderson*, 210 Ariz. at 340 ¶ 40, 111 P.3d at 382 ("We begin from the premise that any photograph of the deceased in any murder case is relevant because the fact and cause of death are always relevant in a murder prosecution." (internal quotations, edits, and citation omitted)); *State v. Chapple*, 135 Ariz. 281, 288, 690 P.2d 1208, 1215 (1983), *superseded on other grounds by* A.R.S. § 13-756 (concluding that photographs are admissible "to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime . . . [and] to illustrate or explain testimony").

**¶86** The crime scene photographs were used by a detective to describe the scene, including Maria's body when found, and to demonstrate she was dragged into the bathtub. The photographs depicted different perspectives of the scene and were not needlessly cumulative. *See* Ariz. R. Evid. 403.

**¶87** None of the photographs were unduly gruesome. *Cf. State v. Anderson*, 210 Ariz. 327, 340 ¶¶ 41, 43, 111 P.3d 369, 382 (2005) (finding photographs depicting human decomposition, bloating, and skin slippage

and discoloration admissible). As we have previously noted, "[t]here is nothing sanitary about murder, and there is nothing in Rule 403 . . . that requires a trial judge to make it so." *State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997).

### 5. References to Maria's son

**¶88** The trial court admitted into evidence a partially redacted transcript of Detective Caraballo's interview with Escalante-Orozco, which was also read to the jury. Escalante-Orozco argues for the first time that the detective's repeated questions about the impact of Maria's murder on her young son were irrelevant and unduly prejudicial and should have been excluded as improper victim-impact evidence. He contends the court deprived him of a fair trial by not doing so. We review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

**¶89** The trial court did not err by permitting introduction of the detective's questions. Detective Caraballo's questions provided context for Escalante-Orozco's repeated assertions that he did not kill Maria. *Cf. State v. Boggs*, 218 Ariz. 325, 335 ¶ 81, 185 P.3d 111, 121 (2008) (acknowledging that an officer's statements can be admissible to provide context for the suspect's answers). Also, the statements were not unduly prejudicial. Detective Caraballo's references to Maria's son were not overly descriptive (e.g., "And that's what you want me to tell this boy?" "Imagine what, what trauma happening [sic] to this boy"). The jury knew from other evidence that Maria's son was in the apartment when his mother was killed, that his clothes were bloody, and, according to Escalante-Orozco, that the child appeared "scared . . . in the corner" when Escalante-Orozco "woke up" on top of Maria and asked, "[w]hat's wrong, son?" and "what happened?" The detective's references did not add anything new.

### 6. Prosecutorial misconduct in closing argument

**¶90** Escalante-Orozco argues for the first time that the prosecutors engaged in several acts of misconduct during closing arguments that individually and cumulatively deprived him of due process and a fair trial under the state and federal constitutions. We review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

**¶91**       This Court will reverse a conviction for prosecutorial misconduct when "(1) the prosecutor committed misconduct and (2) a reasonable likelihood exists that the prosecutor's misconduct could have affected the verdict." *State v. Benson*, 232 Ariz. 452, 463 ¶ 40, 307 P.3d 19, 30 (2013). Even if individual acts of misconduct do not necessitate reversal, we must decide whether the acts collectively evidence "persistent and pervasive misconduct." *See State v. Bocharski*, 218 Ariz. 476, 491–92 ¶ 74, 189 P.3d 403, 418–19 (2008) (citation omitted). We will reverse when "the cumulative effect of the alleged acts of misconduct shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *Id.* at 492 ¶ 74, 189 P.3d at 419 (internal quotation and citation omitted).

### (a)       DNA

**¶92**       The prosecutors argued in closing that Escalante-Orozco's DNA was found "inside of Maria's vagina," "on the back of Maria's nightshirt," and "in her and on her." Escalante-Orozco asserts that these statements mischaracterized the evidence and constituted prosecutorial misconduct.

**¶93**       The prosecutors inaccurately stated that Escalante-Orozco's DNA was discovered in and on Maria rather than accurately stating that samples taken from Maria's body yielded Y-STR profiles that did not exclude him. Even if the prosecutors' inaccurate remarks constituted "misconduct," Escalante-Orozco has failed to show a reasonable likelihood that the comments affected the verdict. Stoller explained several times that the Y-STR results did not establish that the DNA belonged to Escalante-Orozco but only revealed that he could not be excluded as having provided it. She also explained the statistics for each Y-STR result to demonstrate that Y-STR DNA evidence is not as discriminating as other types of DNA evidence and to inform the jury that numerous men could have provided the DNA. The court also read a stipulation to the jury immediately before closing arguments that Escalante-Orozco's Y-STR profile matched five profiles in a local DNA database of approximately 3800 Y-STR profiles. Elsewhere in closing, the prosecutors correctly described the Y-STR results as not excluding Escalante-Orozco or his paternally related male relatives. Defense counsel repeatedly emphasized that the Y-STR DNA was not discriminating. In sum, the jury was well aware that the Y-STR profile

28

evidence did not conclusively establish Escalante-Orozco as the source of DNA found in and on Maria. A new trial is not warranted.

### (b) Maria's son

**¶94** Escalante-Orozco argues that the prosecutor "improperly injected facts outside the record," "inflame[d] the jury," and introduced irrelevant victim-impact evidence by asserting in closing argument that Maria's son witnessed the crimes.

**¶95** Prosecutors are given "[w]ide latitude" in closing argument and "may comment on evidence and argue all reasonable inferences therefrom." *State v. Dumaine*, 162 Ariz. 392, 401, 783 P.2d 1184, 1193 (1989). The prosecutor here reasonably inferred from the evidence that Maria's son saw what happened. The argument was not improper victim-impact evidence. It explained why the son was scared when Escalante-Orozco spoke to him—the son had witnessed the crimes—thereby casting doubt on Escalante-Orozco's claim that he did not kill Maria. *Cf. State v. Nelson*, 229 Ariz. 180, 190 ¶ 43, 273 P.3d 632, 642 (2012) ("Statements referring to the victim's family members are not improper . . . if they are supported by the evidence. . . . Such arguments are proper as long as emotion does not reign over reason." (internal quotation and citation omitted)).

**¶96** The prosecutor also argued that Escalante-Orozco "must have had blood all over his face, in his hair, in his hands. Everywhere. And that's the face he looked at that little boy with." Prosecutors "should not call the jurors' attention to matters the jury should not consider." *State v. Ovante*, 231 Ariz. 180, 186 ¶ 24, 291 P.3d 974, 980 (2013) (internal quotations, edits, and citation omitted). Even if the prosecutor implicitly asked the jury to consider the impact of Maria's murder on her son, Escalante-Orozco has not shown fundamental error. The statement was brief and made amid lengthy closing arguments. The jurors knew from the evidence that the son was present in the apartment and had seen Escalante-Orozco lying atop Maria's blood-soaked body. The prosecutor's reference did not likely influence the jury. *See Moody*, 208 Ariz. at 460, 94 P.3d at 1155 (stating that a prosecutor's improper remarks do not require reversal unless the jury was probably influenced by them). In short, any error in permitting the remark was not of such magnitude that Escalante-Orozco could not possibly have received a fair trial. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

### (c)    Misstatement of evidence

¶97        The prosecutor inaccurately argued that Escalante-Orozco "[made] it clear that he did not go into [Maria's] apartment during the day [of the murder], even though Mr. Anderson said he was there." In fact, Escalante-Orozco admitted to Detective Caraballo that he worked in Maria's apartment that day.

¶98        It is improper for a prosecutor to misstate evidence, and, "if done intentionally, would be a serious breach of the prosecutor's duty." *State v. Cannon*, 148 Ariz. 72, 77, 713 P.2d 273, 278 (1985). Nothing indicates that the prosecutor here intentionally misstated the evidence. Regardless, Escalante-Orozco has not shown that the misstatement likely affected the verdict. The comment was brief, and the trial court instructed the jury that the lawyers' closing arguments were not evidence, thereby lessening the impact of the prosecutor's misstatement. *See Forde*, 233 Ariz. at 568 ¶ 104, 315 P.3d at 1225.

### (d)    Impugning defense counsel's integrity

¶99        Escalante-Orozco argues that the prosecutor impugned the defense in rebuttal closing argument by arguing that defense counsel "pound[ed] the table" and tried to "distract [the jury] from the real issue . . . of the defendant's guilt in this case." It is improper to "impugn the integrity or honesty of opposing counsel." *Newell*, 212 Ariz. at 403 ¶ 66, 132 P.3d at 847. But even if the prosecutor's argument was improper, the trial court did not commit fundamental error by failing to sua sponte strike the comments or grant a mistrial. The jurors likely did not give much if any weight to the prosecutor's criticism. It was not focused on any specific theory advanced by defense counsel. And, contrary to the prosecutor's remarks, defense counsel's arguments were grounded on the evidence and the court's instructions of law. We cannot say that any error went to the foundation of the defense or was of such magnitude that Escalante-Orozco could not possibly have received a fair trial. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

### (e)    Appealing to jurors' emotions

¶100       While an autopsy photograph of Maria was displayed to the jury, the prosecutor ended her rebuttal closing argument as follows:

> She was an actual human being. And you are the only ones who can give her any sense of justice at this point. It has been 12 years. It has been 12 years. She's been waiting and she's in the courtroom. And he took her voice and he stole it forever. So you get to be her voice. You get to find him guilty. So go back there and do that.

Escalante-Orozco argues that these remarks improperly appealed to the jurors' sympathies and passions.

**¶101** Although a prosecutor has wide latitude in making closing arguments and "may comment on the vicious and inhuman nature of the defendant's acts," counsel cannot appeal to the passions and fears of the jury. *State v. Comer*, 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990). By telling jurors they were the only ones who could give Maria justice and asking them to be her voice, all while displaying an autopsy picture, the prosecutor improperly appealed to the jurors' passions. *Cf. State v. Ottman*, 144 Ariz. 560, 562, 698 P.2d 1279, 1281 (1985) (concluding prosecutor improperly reminded jurors that victim's wife was awaiting the verdict, that her "life is totally destroyed" and that "she wants justice"); *State v. Bible*, 175 Ariz. 549, 603, 858 P.2d 1152, 1206 (1993) ("A jury in a criminal trial is not expected to strike some sort of balance between the victim's and the defendant's rights.").

**¶102** The trial court did not commit fundamental error by failing to sua sponte strike the prosecutor's comments and provide a corrective jury instruction. *See Bible*, 174 Ariz. at 603, 858 P.2d at 1206 (describing the remedy for improper closing remarks). The comments were fleeting, and the court instructed jurors "not [to] be influenced by sympathy." The error was not of such magnitude to deprive Escalante-Orozco of a fair trial. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

### (f) Cumulative effect

**¶103** The cumulative effect of the improper closing argument statements does not show that the prosecutors intentionally acted with indifference, or specific intent, to prejudice Escalante-Orozco. *See Bocharski*, 218 Ariz. at 491–92 ¶ 74, 189 P.3d at 418–19. The comments were brief, made amid lengthy arguments, and did not constitute persistent and pervasive

misconduct. And as explained, the court's instructions diminished the statements' impact. The improper statements did not deprive Escalante-Orozco of a fair trial or constitute fundamental error.

### 7. Denial of Rule 20 motion

**¶104** The trial court partially granted Escalante-Orozco's motion for judgment of acquittal pursuant to Rule 20, Arizona Rules of Criminal Procedure, by acquitting him on one count of sexual assault. Escalante-Orozco argues that the court erred by refusing to acquit him of first degree murder, burglary, and the second sexual assault charge. We review the court's ruling de novo. *Boyston,* 231 Ariz. at 551 ¶ 59, 298 P.3d at 899.

**¶105** A motion for judgment of acquittal may be granted only if "no substantial evidence supports the conviction." *State v. Davolt*, 207 Ariz. 191, 212 ¶ 87, 84 P.3d 456, 477 (2004). Substantial evidence exists if "reasonable persons may fairly differ as to whether certain evidence establishes a fact in issue." *Id.* (edits and citation omitted). Substantial evidence may be direct or circumstantial. *State v. Pena*, 209 Ariz. 503, 505 ¶ 7, 104 P.3d 873, 875 (App. 2005).

**¶106** Escalante-Orozco asserts that no substantial evidence supports the sexual assault conviction, and that because the State's entire theory for Maria's murder was predicated on sexual assault, the court erred by not acquitting him of all charges. A person commits sexual assault by "intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any person without consent of such person." A.R.S. § 13-1406(A). As charged here, Escalante-Orozco engaged in "sexual intercourse" if he penetrated Maria's vulva with any part of his body or with any object. *See id.* § 13-1401(A)(4). He did so "without consent" if Maria was "coerced by the immediate use or threatened use of force" against her or her property. *Id.* § 13-1401(A)(7)(a).

**¶107** Substantial evidence supports the sexual assault conviction. Escalante-Orozco admitted to Detective Caraballo that he woke up on top of Maria with his hand on her genitals. Evidence showed that Maria had lacerations around and inside her vagina, including three lacerations on the inner parts of her minor labia, a laceration on the posterior fornix, where the labia come together in the back part of the vaginal wall, and two one-and-a-half inch lacerations on the walls of her vagina. The State's expert

testified that the injuries were "blunt force injuries" that could have been caused by anything "from a fingernail to a larger foreign object." The expert also concluded, based on the hemorrhaging around the vaginal lacerations, that they were likely caused within twenty-four hours of Maria's death. The DNA evidence established that Escalante-Orozco could not be excluded as the contributor of the DNA tested from the vaginal swab. The trial court did not err by refusing to grant the rest of the Rule 20 motion.

### D. Aggravation Phase Issues

#### 1. (F)(6) jury instruction

**¶108** Escalante-Orozco argues that the trial court's jury instruction on the "especially cruel" aggravator, A.R.S. § 13-752(F)(6), was unconstitutionally vague because it "inaccurately and unconstitutionally suggested the jury was only required to find the murder cruel, and not that the murder was '*especially* so.'" We review de novo whether the instruction correctly stated the law. *Benson*, 232 Ariz. at 462 ¶ 38, 307 P.3d at 29.

**¶109** Although the (F)(6) aggravator is facially vague, that defect "may be remedied with an instruction requiring the jury to find the victim was conscious during the mental anguish or physical pain and also . . . the defendant knew or should have known that the victim would suffer." *Id.* at 463 ¶ 39, 307 P.3d at 30 (internal quotation and citation omitted); *see also State v. Anderson*, 210 Ariz. 327, 352–53 ¶¶ 109–14, 111 P.3d 369, 394–95 (2005). The instruction contained these essential factors, and further narrowing was not required.

#### 2. Prosecutorial misconduct in closing argument

**¶110** Escalante-Orozco argues for the first time that the prosecutors engaged in several acts of misconduct during closing arguments that individually and cumulatively deprived him of due process and a fair trial under the state and federal constitutions. We review for fundamental error. *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

##### (a) Sexual assault as proof of mental anguish or physical pain

¶111        Escalante-Orozco argues that the prosecutor misstated the law by arguing that "evidence of rape is proof of mental pain and suffering" under the (F)(6) aggravator. Escalante-Orozco correctly notes that we have been unwilling to say that all murders involving a sexual assault automatically qualify as especially cruel under (F)(6). *See State v. Schackart*, 190 Ariz. 238, 248, 947 P.2d 315, 325 (1997). But the prosecutor did not urge a per se rule. After making the above-quoted statement, he focused on Maria's sexual-assault injuries, which can contribute to a finding that a murder was especially cruel. *Cf. Newell*, 212 Ariz. at 406 ¶ 85, 132 P.3d at 850 (concluding that "sexual assault-related bruises and injuries" and other evidence supported finding of especial cruelty); *Schackart*, 190 Ariz. at 248, 947 P.2d at 325 (stating that the sexual assault and other evidence supported a finding of especial cruelty). He also argued that Maria's multiple stab wounds and other injuries demonstrated mental anguish and physical pain. The statement was not improper.

¶112        Escalante-Orozco also argues that relying on the sexual assault to satisfy the (F)(6) aggravating factor violated double jeopardy by impermissibly "double counting" the sexual assault as the predicate for felony murder and to establish the (F)(6) aggravator. We have previously held that an element of a crime may be used for purposes of sentencing enhancement and establishing aggravation. *State v. Cruz*, 218 Ariz. 149, 169 ¶ 130, 181 P.3d 196, 216 (2008) ("In [*State v.*] *Lara* [171 Ariz. 282, 830 P.2d 802 (1992)], we held that an element of a crime may also be used to aggravate a sentence. We have repeatedly applied the *Lara* rule in the capital context." (internal citation omitted)). Escalante-Orozco does not explain why we should revisit those decisions, and we decline to do so.

### (b)        Presence of Maria's son during the murder

¶113        The prosecutor asked jurors to "[i]magine the fear that Maria was experiencing as she tried to fight off the defendant, knowing that her son was present in the apartment, could have been the next victim." He concluded that Maria not only feared for herself but for her son's safety. Escalante-Orozco argues that this argument was improper because (1) no evidence suggested that the son was present during the murder, and (2) Maria's worry for her son's safety could not constitute mental anguish under (F)(6).

¶114        We reject Escalante-Orozco's first argument because the prosecutor did not say the son saw the murder; he said the son was in the apartment, which was supported by the evidence.  We likewise reject the second argument.  Escalante-Orozco does not cite any authority suggesting that fear for a young son's safety cannot add to the mental anguish experienced by a murder victim.  Quite to the contrary, common sense tells us it does.  *Cf. State v. Carter*, 988 S.W.2d 145, 151 (Tenn. 1999) (upholding jury's especial cruelty finding in part because murder victims feared for each other's safety and the safety of their daughter who hid in the home); *id.* ("[M]ental torment is intensified when a victim . . . anticipates the harm or killing of [a] close relative and is helpless to assist.").

### (c)        Length of time Maria was conscious

¶115        Escalante-Orozco argues that the prosecutor improperly speculated by arguing that the killing was "unusually great or significant" based on "the length of time that Maria [] suffered."  This was fair argument.  Dr. Ross testified that a stab wound to Maria's neck was the primary cause of death.  He opined that it would have taken "maybe 10, 15, 20 minutes" before Maria was unable to purposefully move to resist continuing attacks and "anywhere from several minutes to probably upwards of an hour" for her to die.  This testimony, together with evidence of the sexual assault, and Maria's other wounds, including defensive wounds, supported a reasonable inference that Maria was conscious and suffered for a significant length of time.

### E.        Penalty Phase Issues

### 1.        "Future dangerousness"

¶116        The trial court instructed the jury that if it decided to impose a life sentence, "the Court will decide whether it would be imprisonment for life without the possibility of release from prison, or imprisonment for life with the possibility of release after 25 years."  Escalante-Orozco objected, arguing that the jurors should not consider his potential for release when deciding whether to impose the death penalty.  He also asked the court to tell jurors that a person convicted of first degree murder could be released only through clemency proceedings as Arizona law does not provide for parole.  The trial court denied the objection and refused the

requested instruction because it speculated about the future availability of parole.

¶117 Escalante-Orozco argues that the court's refusal to give his requested instruction violated *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality opinion). In *Simmons*, the Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156. Parole is available in Arizona only for juveniles and individuals who committed a felony before January 1, 1994. A.R.S. § 41-1604.09(I). (Escalante-Orozco does not fall into either category.) This Court has repeatedly held that even when a defendant's future dangerousness is at issue, the type of instruction given by the trial court here does not violate *Simmons* because future release is possible. *See, e.g.*, *State v. Lynch*, 238 Ariz. 84, 103 ¶ 65, 357 P.3d 119, 138 (2015), rev. *Lynch v. Arizona*, 136 S. Ct. 1818 (2016). But the Supreme Court recently rejected this holding. *Lynch v. Arizona*, 136 S. Ct. at 1819. The Court concluded that the possibilities of clemency or a future statute authorizing parole "[does not] diminish[] a capital defendant's right to inform a jury of his parole ineligibility." *Id.* at 1819.

¶118 The State contends that Escalante-Orozco waived the *Simmons* issue because he never explicitly argued that the State placed future dangerousness at issue. We disagree. By objecting to the instruction and explaining that the jury should not consider the possibility of his release in deciding whether to impose the death penalty, Escalante-Orozco sufficiently preserved the issue. *Cf. State v. Fulminante*, 193 Ariz. 485, 503 ¶ 64, 975 P.2d 75, 93 (1999) ("An objection is sufficiently made if it provides the judge with an opportunity to provide a remedy."). This is especially so as he also proposed an instruction that accurately described the only available pathway to release—clemency—and argued in his motion for a new trial that *Simmons* applied. Escalante-Orozco did not need to explicitly contend that his future dangerousness was at issue for the judge to comprehend the nature of the objection and fashion a remedy.

¶119 The State next argues that *Simmons* and *Lynch* do not apply because the prosecutor did not put future dangerousness at issue. The prosecutor did not have to explicitly argue future dangerousness for it to be at issue; instead, it is sufficient if future dangerousness is "a logical

inference from the evidence" or is "injected into the case through the State's closing argument." *Kelly v. South Carolina*, 534 U.S. 246, 252 (2002).

**¶120**       *Kelly* provides guidance. There, the Court found that the trial court should have given a *Simmons* instruction because the defendant's future dangerousness was put at issue by the prosecutor introducing evidence at the sentencing hearing of the defendant's violent tendencies and by using violence-invoking nicknames to refer to the defendant. *Id.* at 252–55. The prosecutor "call[ed] correctional officers to testify to an escape attempt, to testify to the fact that [defendant] has possession of a shank, by calling inmates who testified to [defendant's] behavior in the jail . . . [and] his plan to take a female guard hostage." *Id.* at 249 (internal edits omitted). In his closing argument, the prosecutor called the defendant "the butcher of Batesburg," "Bloody Billy," and "Billy the Kid," invoking images of violent men, and told the jurors he hoped they would "never in their lives again have to experience being some thirty feet away from such a person." *Id.* at 249–50, 255 (internal edits omitted).

**¶121**       During the penalty phase here, the prosecutor introduced evidence that Escalante-Orozco choked his ex-wife, Cecilia, by pinning her neck down with his knee; yelled at Cecilia and shook her by the arms; threw Cecilia down on the bed, held a knife to her throat, and threatened her life; and bit off part of someone's finger in a fight and showed the piece to Cecilia after returning home. The prosecutor also introduced evidence that Escalante-Orozco once fought with Cecilia, tore off her clothes, threatened her with a knife, and dragged her outside by her hair while she was naked. With regard to Maria's murder, the prosecutor brought out the graphic photographs of the crime scene and autopsy photos and went over the brutality of the murder.

**¶122**       In closing, the State argued:

> Sometimes in life there are people who have done so much evil they give up their right to live. This defendant has done just that. You have the attack on [Maria]. And there's some other evidence you can consider that has been presented to rebut any mitigation that you may find in this case. And those are the incidents that were described to you by Cecilia Banda.

> The defendant, according to Cecilia Banda, she told you, he attacked her on two different occasions armed with a knife. On at least one of those occasions, her hair was pulled.
>
> One incident occurred in Mexico, one incident occurred in the United States. You also heard of another incident that was witnessed by her sister, Patricia, where the defendant was choking her. You also heard about another incident in Mexico where the defendant came home after having gotten into a fight with someone, he came home with a person's finger.
>
> This defendant has done so much evil that he has given up his right to live. He has forfeited his right to live based on the crime that he committed March 10th of 2001.

The other-act evidence and the prosecutor's arguments, like those at issue in *Kelly*, put Escalante-Orozco's future dangerousness at issue.

**¶123** The State argues it did not place future dangerousness at issue because the evidence of other acts of violence was offered to rebut mitigation evidence. The *Kelly* Court rejected a similar argument: "Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." *Id.* at 254. Although the purpose of introducing the evidence may have been to rebut Escalante-Orozco's mitigation evidence, the State used that evidence, together with the attack on Maria, as examples of the evil Escalante-Orozco committed that "forfeited his right to live," thereby putting Escalante-Orozco's future dangerousness at issue.

**¶124** The State also argues that it did not place future dangerousness at issue because the prosecutor focused exclusively on Escalante-Orozco's past actions. Past instances of violent behavior, however, can "raise a strong implication of 'generalized. . . future dangerousness.'" *See id.* at 253 (quoting *Simmons*, 512 U.S. at 171). As recognized by the Court in *Kelly*, "[a] jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free . . . as a parolee." *Id.* at 253–54.

**¶125**        The State finally argues that any error was harmless.  It is not clear whether *Simmons* error is subject to harmless error review.   The Supreme Court has stated that "most constitutional errors can be harmless." *Neder v. United States*, 527 U.S. 1, 8, (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)).  But it did not perform a harmless error analysis or mention harmless error in any of its cases considering a *Simmons* error.  *See Lynch v. Arizona*, 136 S. Ct. at 1818–20; *Kelly*, 534 U.S. at 257–58; *Shafer v. South Carolina*, 532 U.S. 36, 54–55 (2001); *Simmons*, 512 U.S. at 171.

**¶126**        We do not have to decide whether a *Simmons* error can ever be harmless.  Here, even if we assume such errors can be harmless, the State has not proven "beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *Henderson*, 210 Ariz. at 567 ¶ 18, 115 P.3d at 607.  Only one aggravator was found and a great deal of mitigating evidence was introduced.  Escalante-Orozco is in his forties, and the jury could have believed he would live to see release.  The jury deliberated for about thirteen hours, which suggests it gave careful consideration to the sentencing options.  We cannot know what role the possibility of release played in the jurors' minds as they decided the propriety of the death penalty.  *Cf. Andres v. United States*, 333 U.S. 740, 752 (1948) ("In death cases, doubts with regard to the prejudicial effect of trial error should be resolved in favor of the accused."); *Andrews v. Shulsen*, 802 F.2d 1256, 1263–64 (10th Cir. 1986) ("[B]ecause there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding *difference in the need for reliability* in the determination that death is the appropriate punishment in a specific case.'" (quoting *Zant v. Stephens*, 462 U.S. 862, 884–85 (1983))).

**¶127**        For all these reasons, the State placed Escalante-Orozco's future dangerousness at issue.  In light of the Supreme Court's decision in *Lynch*, the trial court erred by refusing to tell the jury that Escalante-Orozco was ineligible for parole.  The error was not harmless.  Unless our independent review reveals that the death penalty is unwarranted, the trial court must conduct new penalty phase proceedings.

>    **2.      Matters preserved for review and likely to arise on remand**
>
>        **(a)      Jury determination of intellectual disability**

¶128     During the penalty phase, the court instructed the jury that if it found that Escalante-Orozco had an intellectual disability by a preponderance of the evidence, it "must vote for a life sentence." If the jury did not find an intellectual disability, it could still consider the evidence as a mitigating circumstance.

¶129     Escalante-Orozco argues that the trial court abused its discretion by denying his request for a bifurcated penalty-phase proceeding whereby the jury would first render a verdict on intellectual disability as a bar to a death sentence before deliberating on whether the mitigation was sufficiently substantial to call for leniency. He asserts that failing to bifurcate "unconstitutionally conflated the jury's factual determination of [intellectual disability] with the jury's moral sentencing decision" and that there was a significant probability that once the jury found that he did not have an intellectual disability, it would fail to view that evidence as mitigating.

¶130     Relying primarily on this Court's decision in *Grell II*, the State responds, and asserts in its cross-appeal, that Arizona law prohibits a jury from deciding whether a defendant has proven intellectual disability as a bar to a death sentence. It contends that the court erred by instructing the jury otherwise, making the bifurcation issue moot.

¶131     We take up the cross-appeal first. When *Grell II* was decided, the trial court was required to appoint a prescreening psychological expert in a capital case to determine the defendant's IQ and then, depending on the score, either allow the death penalty to remain a sentencing option or decide, after an *Atkins* hearing, whether the defendant had proven an intellectual disability that bars a death sentence. *See* A.R.S. § 13-703.02(B)– (H) (2002). If the trial court did not find an intellectual disability, "the court's finding [did] not prevent the defendant from introducing evidence of the defendant's mental retardation or diminished mental capacity as a mitigating factor at the penalty phase of the sentencing proceeding." *Id.* § 13-703.02(H) (2002).

¶132     Grell argued that the trial court erred by not permitting the jury to decide whether intellectual disability serves as a bar to execution, even though the trial judge had made a pretrial determination on the issue. *Grell II*, 212 Ariz. at 527 ¶ 48, 135 P.3d at 707. This Court disagreed. *Id.* at ¶¶ 48–49. We acknowledged that a jury determination would be

permissible but found that the legislature had enacted a system in § 13-703.02 in which "[t]he judge hears [intellectual disability] evidence as a legal bar to execution and the jury hears it for mitigation purposes." *Id.*

**¶133** While *Grell II* was pending, the legislature amended § 13-703.02 to permit a capital defendant to opt out of the pretrial *Atkins* determination. *See* A.R.S. § 13-703.02(B) (2006) (requiring the pretrial assessment and determination "unless the defendant objects" to appointment of the prescreening psychological expert to determine the defendant's IQ). In that circumstance, "the defendant waives the right to a pretrial determination of [intellectual disability] status," but "[t]he waiver does not preclude the defendant from offering evidence of the defendant's [intellectual disability] in the penalty phase." *Id.* The legislature also deleted "as a mitigating factor" from subsection H so that if the trial court finds that the defendant is not intellectually disabled, that finding "does not prevent the defendant from introducing evidence of the defendant's [intellectual disability] or diminished mental capacity at the penalty phase." *Id*. § 13-703.02(H) (2006).

**¶134** The amendments to § 13-703.02 (renumbered § 13-753) reflect the legislature's intent to permit a jury to decide whether a defendant has proven an intellectual disability that bars a death sentence. The consequence for opting out of pretrial *Atkins* procedures is waiver of a "pretrial determination of status"—not any determination of status. *See id.* § 13-753(B). The only remaining recourse for making that determination is during the penalty phase, where the trier-of-fact (typically a jury) is charged with making "all factual determinations required by this section or the Constitution of the United States or this state." *See id.* §§ 13-752(P), -753(H); *see also id.* § 13-752(H) ("The trier of fact shall determine unanimously whether death is the appropriate sentence."). The legislature further demonstrated its intent by deleting language that arguably limited the trier-of-fact's consideration of intellectual disability evidence to being "a mitigating factor." *See* § 13-753(H).

**¶135** Our interpretation is not limited to defendants who opt out of pretrial *Atkins* determinations. A defendant's presentation of evidence may strengthen between the *Atkins* hearing and the penalty phase. *Cf. Grell III*, 231 Ariz. at 155 ¶ 11, 291 P.3d at 352 ("Grell presented substantially more—and more convincing—evidence of adaptive skill deficits in his 2009 resentencing hearing than he presented in 2005."). No reason exists to

conclude that the legislature intended to preclude consideration of intellectual disability as a bar merely because the defendant did not carry the burden of proof in pretrial proceedings.

¶136 Also, § 13-753's pretrial procedures do not necessarily permit a complete presentation of intellectual disability evidence. For example, if the prescreening psychological expert concludes that a defendant's IQ is greater than seventy-five, the court cannot dismiss the notice of intent to seek the death penalty. *See id.* § 13-753(C). In that scenario, the defense is not entitled to contest the score, present contrary evidence, or present adaptive behavior evidence. The only time to permit such evidence and argument is during the penalty phase.

¶137 Permitting the trier-of-fact in the penalty phase to determine intellectual disability as a bar to the death penalty also fulfills the legislature's intent to avoid executing intellectually disabled individuals. *See* 2001 Ariz. Legis. Serv. Ch. 260, § 3 (West) ("It is the intent of the legislature that in any case in which this state files a notice of intent to seek the death penalty . . . a defendant with [intellectual disability] shall not be executed in this state."). If we adopt the State's position, a jury could impose the death penalty in light of the strength of aggravating circumstances even though it concluded that a defendant has an intellectual disability. This result, which would contradict legislative intent and violate the Eighth Amendment, is avoided by our interpretation of § 13-753.

¶138 In sum, the trial court did not err by instructing the jury that it must impose a life sentence if it found by a preponderance of the evidence that Escalante-Orozco is intellectually disabled. *See Grell III*, 231 Ariz. at 160 ¶ 35, 291 P.3d at 357 (using the preponderance of the evidence standard to decide whether Grell proved an intellectual disability).

¶139 We next turn to Escalante-Orozco's argument that the court erred by refusing to conduct a bifurcated penalty phase. Nothing requires a bifurcated proceeding, and here, nothing would have been gained. The court instructed the jury that if it finds an intellectual disability by a preponderance, it must impose a life sentence. The court further instructed that if the jury did not find an intellectual disability, it should consider the disability evidence as a mitigating circumstance that alone or with other mitigating circumstances may be substantial enough to call for a life

sentence. The court did not err by conducting a single penalty phase proceeding.

### (b)    Admission of other-act evidence

**¶140**    Escalante-Orozco's ex-wife and her sister testified in rebuttal about acts of violence he had perpetrated against the ex-wife and another person. For example, the jury heard that Escalante-Orozco had put a knife against his then-pregnant wife's throat and threatened to kill her. The trial court ruled that this evidence was relevant to rebut Escalante-Orozco's intellectual disability claim because "[p]art of adaptive behavior includes social responsibility." Escalante-Orozco contends that the court violated his due process rights because the evidence was irrelevant, highly prejudicial, and served as a non-statutory aggravator.

**¶141**    Our rules of evidence do not govern the admission of evidence during the penalty phase. *State v. Chappell*, 225 Ariz. 229, 239 ¶ 35, 236 P.3d 1176, 1186 (2010). As long as rebuttal evidence is relevant to the thrust of a defendant's mitigation and is not unduly prejudicial, we defer to the trial court's ruling. *State v. Burns*, 237 Ariz. 1, 28 ¶ 127, 344 P.3d 303, 330 (2015); A.R.S. § 13-751(C). We review that ruling for an abuse of discretion. *State v. Nordstrom*, 230 Ariz. 110, 114 ¶ 8, 280 P.3d 1244, 1248 (2012).

**¶142**    The "thrust" of Escalante-Orozco's mitigating evidence was that he had an intellectual disability, which required proof, among other things, that he had a significant impairment in adaptive behavior. *See* A.R.S. § 13-753(K)(3). Dr. Sergio Martinez, the State's expert, testified that maladaptive behaviors–drug use, excessive drinking, and the like – must be considered in deciding whether a person's ability to function stems from a significant impairment in adaptive behavior. The State asserts that evidence that Escalante-Orozco was controlling and drank alcohol during at least two of his violent episodes demonstrated maladaptive behavior and was therefore relevant. But the State does not point to any evidence linking Escalante-Orozco's violent acts to a maladaptive behavior disorder that should be considered in deciding whether his adaptive behavior skills are impaired by an intellectual disability.

**¶143**    Permitting the other-act evidence without linking it to maladaptive behavior also unfairly prejudiced Escalante-Orozco. *See State*

*v. Smith*, 215 Ariz. 221, 232 ¶ 54, 159 P.3d 531, 542 (2007) (stating that unduly prejudicial rebuttal evidence must be excluded if it would make the proceeding "fundamentally unfair"). A real risk existed that the jury treated this evidence as a non-statutory aggravator without a sufficient connection to the adaptive behavior issue. *Cf. State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995) ("In capital cases, the [jury] can give aggravating weight only to evidence that tends to establish an aggravating circumstance enumerated in A.R.S. § 13-[751](F) . . . ."). On remand, the court should not permit the other-act evidence absent evidence linking Escalante-Orozco's violent acts to maladaptive behaviors.

### (c) Jury Instruction – "significant impairment" of adaptive behavior

**¶144** As part of its instruction defining "intellectual disability," the court properly told the jury that Escalante-Orozco must show "a significant impairment in adaptive behavior." *See* § 13-753(K)(1), (3), (5). Escalante-Orozco argues that the court erred by refusing to additionally define "significant impairment" as meaning "performance on a standardized assessment instrument that is approximately two standard deviations below the mean." He asserts that the American Association on Intellectual and Developmental Disorders recognizes this definition, and the instruction was necessary to give meaning to the term "significant." The trial court declined to give the instruction, reasoning that there was disputed testimony on the issue, and the parties could argue the matter to the jury based on the experts' testimony.

**¶145** A court is not required to define every phrase or word used in jury instructions, and the trial court did not err by failing to define "significant" for the jury. *See Forde*, 233 Ariz. at 564 ¶ 82, 315 P.3d at 1221. Neither § 13-753 nor any Arizona opinion adopts the Association's definition, and the experts presented conflicting testimony on the usefulness of standardized tests to assess adaptive behavior. The court properly left the issue to argument based on the experts' testimony.

### (d) Motion for acquittal

**¶146** After submission of evidence in the penalty phase, Escalante-Orozco unsuccessfully moved the court to reconsider its pretrial *Atkins* ruling that he did not suffer from an intellectual disability or, alternatively,

to apply criminal procedure Rule 20 to find he suffers from an intellectual disability that precludes imposition of the death penalty. The court denied the motion as contested issues of fact existed regarding intellectual disability and also ruled that Rule 20 did not apply.

**¶147**		Escalante-Orozco challenges the trial court's ruling that Rule 20 does not apply to deciding whether a defendant has an intellectual disability that bars imposition of the death penalty. Rule 20 applies to "offenses charged in an indictment, information or complaint" or "an aggravating circumstance." Ariz. R. Crim. P. 20. Essentially, Rule 20 tests the sufficiency of the state's evidence. *State v. Neal*, 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984). Because the defendant bears the burden of proving intellectual disability, *see* A.R.S. § 13-753(G), Rule 20 does not apply. Also, intellectual disability is not like an aggravating factor, as Escalante-Orozco argues, because it serves to *exclude* a defendant from death penalty eligibility, and its absence does not increase an available penalty. *See Grell II*, 212 Ariz. at 526–27 ¶¶ 44, 46, 135 P.3d at 706–07.

**¶148**		Escalante-Orozco is correct that the court wrongly applied a civil summary judgment standard to deny the motion for reconsideration. Should such a motion be filed on remand, the court can consider it upon a showing of good cause pursuant to Arizona Rule of Criminal Procedure 16.1. *See Grell III*, 231 Ariz. at 161 ¶ 39, 291 P.3d at 358 (Bales, V.C.J,, concurring).

## II.	Independent Review

**¶149**		Because Escalante-Orozco murdered Maria before August 1, 2002, we independently review the aggravation and mitigation findings and the propriety of the death sentence. A.R.S. § 13-755(A); *Grell III*, 231 Ariz. at 154 ¶ 3, 291 P.3d at 351. We review the record de novo without deference to the jury's findings or decisions. *State v. Prince*, 226 Ariz. 516, 539 ¶ 93, 250 P.3d 1145, 1168 (2011).

### A.	Intellectual disability

**¶150**		Escalante-Orozco bore the burden of proving intellectual disability and did so if he showed by a preponderance of the evidence that (1) he has significantly subaverage general intellectual functioning, (2) existing concurrently with significant impairment in adaptive behavior,

and (3) the onset of these conditions occurred before he turned eighteen. A.R.S. § 13-753(K)(3); *Grell III*, 231 Ariz. at 154 ¶ 3, 291 P.3d at 351. To decide whether Escalante-Orozco met this burden, we review the evidence presented during the *Atkins* hearing and the penalty phase. *Cf. State v. Blazak*, 131 Ariz. 598, 602–03, 643 P.2d 694, 698–99 (1982) (reviewing entire record, including evidence presented in post-conviction review, to decide propriety of death sentence).

### 1. General intellectual functioning

¶151    Escalante-Orozco proved that he has a significantly subaverage general intellectual functioning by showing that it was more likely than not that he has an IQ of seventy or below. *See* A.R.S. § 13-753(K)(5) (defining "subaverage general intellectual functioning"); *Pima Cnty. v. Pima Cnty. Law Enforcement Merit Sys. Council*, 211 Ariz. 224, 228 ¶ 21, 119 P.3d 1027, 1031 (2005) (acknowledging that "preponderance of the evidence" means "more likely than not"). Three experts administered a total of four IQ tests to Escalante-Orozco. The experts used a 95% confidence interval as the margin of error, which means we can be confident that 95% of the time Escalante-Orozco would have scored within the identified range of scores. Each expert scored tests "normed" to different cultural groups to determine how Escalante-Orozco's scores compared to the average range of test scores (85 to 115) in that group.

¶152    Escalante-Orozco scored seventy or below on tests administered by all three experts. Dr. Julio Ramirez, the court-appointed, prescreen expert, administered the WAIS-III test using United States norms and scored a full-scale IQ score of seventy, with a 95% confidence interval of sixty-seven to seventy-five. Dr. Francisco Gomez, the defense expert, administered the WAIS-III using Mexican norms and scored a full-scale IQ score of sixty-six, with a 95% confidence interval of sixty-three to seventy-one. Dr. Sergio Martinez, the State's expert, administered the WAIS-IV test using United States norms and scored a full-scale IQ score of sixty-five, with a 95% confidence interval of sixty-two to seventy.

¶153    Although Escalante-Orozco scored a full-scale IQ of seventy-seven on the Bateria-III instrument administered by Dr. Martinez, who identified a 95% confidence interval from seventy-five to seventy-nine, we are not persuaded that this score diminishes the likelihood that Escalante-Orozco's IQ is seventy or below. Three other tests placed his IQ at seventy

or below, and the median IQ scores for all tests was sixty-six and seventy. Also, as Dr. Gomez pointed out, the Bateria-III is normed only to age twenty-nine. For older test subjects, like Escalante-Orozco, scores are based on a statistical prediction.

¶154        Escalante-Orozco also proved that his significantly subaverage general intellectual functioning started before he turned eighteen. Because Escalante-Orozco was never tested as a child, and his school records are few and unrevealing, we must rely only on anecdotal accounts of his childhood. But that is enough. According to Martha Cano Muñoz, his first-and-second-grade teacher, she tutored Escalante-Orozco after school because he had a difficult time in class and even with the extra tutoring, he never caught up. Escalante-Orozco failed and repeated second grade, did not pass the second time, and dropped out of school.

¶155        Other people confirmed Escalante-Orozco's intellectual difficulties during childhood. A brother reported that Escalante-Orozco would let horses out and miscount them so he would fail to put them all back. A nephew testified that when they sold gum at baseball games as children, Escalante-Orozco was not permitted to do so alone because he would not give the correct change. The same nephew said Escalante-Orozco had trouble measuring things because of his difficulties in math. A childhood neighbor remembered that Escalante-Orozco had difficulties counting and "couldn't learn" when she tried to help him with homework.

¶156        In sum, Escalante-Orozco proved that he had significantly subaverage general intellectual functioning that started before he turned eighteen.

### 2.        Adaptive behavior

¶157        Conflicting evidence exists as to whether Escalante-Orozco has a significant impairment in adaptive behavior.

¶158        Dr. Martinez and Dr. Gomez each administered adaptive behavior skills tests and conducted clinical interviews with Escalante-Orozco, his friends, family, and acquaintances. (As the prescreen expert, Dr. Ramirez only evaluated IQ and did not address adaptive behavior.) Dr. Martinez testified that while Escalante-Orozco has a weakness in academics, specifically math, he does not have significant adaptive

behavior limitations. Dr. Martinez concluded that "maladaptive behaviors" (substance abuse and a character flaw) and a lack of an opportunity for academic advancement, rather than an adaptive behavior limitation, adversely impacts Escalante-Orozco's functioning.

¶159 Dr. Gomez diagnosed Escalante-Orozco as mildly intellectually disabled. He concluded that Escalante-Orozco has significant deficits in at least two skill areas—functional academic skills and communication—which meets the DSM-IV-TR definition of significant adaptive functioning deficits. He disagreed with Dr. Martinez that Escalante-Orozco's academic weakness was due to a lack of opportunity, pointing out that Escalante-Orozco repeatedly failed to learn when friends and family tried to teach him.

¶160 Accounts from friends, family, and acquaintances supported each expert's opinion. For example, Banda testified that during their marriage, Escalante-Orozco got up, dressed, showered, brushed his teeth, and made coffee on his own during the week. Escalante-Orozco bought his own clothes, went to get his hair cut when needed, fixed things around the house, took the correct dosage of medicine when ill, and paid the rent. *See* A.R.S. § 13-753(K)(1) (defining "adaptive behavior" in part as the degree to which a defendant meets standards of personal independence).

¶161 Robert Anderson, Escalante-Orozco's supervisor at the apartments, testified that Escalante-Orozco started as an unskilled worker, but he did a good job, caught on quickly, and had no trouble completing his assigned tasks. Anderson considered him capable of doing skilled work and so kept "adding on to his plate." He worked on drywall, laid subfloors and tile, changed light fixtures, replaced shower heads and drains, and completed other construction and remodeling work. He also got along with his coworkers and showed up for work on time. *See id*. (defining "adaptive behavior" in part as the degree to which a defendant meets standards of social responsibility).

¶162 On the other hand, Escalante-Orozco had trouble calculating the amount of materials needed for construction jobs and how much to charge because he did not understand math. Although a relative tried to teach him, he was not able to learn. Escalante-Orozco sometimes accidentally left his tools at job sites, ran out of gas, and lent money when he needed it himself.

¶163    We need not decide whether Escalante-Orozco proved that he has a significant impairment in adaptive behavior. Even if he does, he did not prove that the condition started before he turned eighteen. *See* A.R.S. § 13-753(K)(3).

¶164    Escalante-Orozco had an unenviable childhood. He was raised as the youngest of twelve children in an extremely poor family in rural Mexico. As previously recounted, Escalante-Orozco struggled in school and dropped out in second grade. Similarly, only two of his siblings advanced beyond third grade and no one attended high school. The children worked to earn money and the family "never had enough to eat." The family lacked sufficient money to send the children to school. Escalante-Orozco also suffered from chronic ear infections, which were painful.

¶165    Despite his circumstances, Escalante-Orozco was quite social as a child and consistently exhibited an ability to meet societal expectations. *See Grell II*, 212 Ariz. at 529 ¶ 62, 135 P.3d at 709. He was well-behaved and possessed a good work ethic. He showed interpersonal skills by being affectionate and playful; for example, he often teased others by covering their eyes and asking, "guess who?" He played tops, marbles, organized baseball, soccer, and other games with friends, which demonstrated an ability to relate to others, form friendships, and interact in social settings. As he aged, he would go out dancing with friends. He was well-liked by the girls in town, and took them horseback riding. He had girlfriends by the time he was thirteen or fourteen, which indicates he could establish romantic relationships. There is no evidence he was victimized, as commonly occurs with intellectually disabled individuals. Indeed, he stood up to older cousins who looked for fights and helped others who got into fights. All but one witness who knew him as a child described Escalante-Orozco as a normal, friendly, and social child.

¶166    Escalante-Orozco was also able as a child to manage daily tasks that did not involve reading and arithmetic. He kept himself clean and took pride in his personal appearance. As a four-to-five-year-old child, he took care of chickens, ducks, pigs, and other farm animals. He also gathered firewood from the woods. His father taught him how to care for sick horses and how to plaster. At age fifteen he moved to another city to live with family members and work at an assembly plant performing some

type of electrical wiring work. There is no evidence that Escalante-Orozco needed extra supervision or support with daily tasks.

¶167  Dr. Gomez based his conclusion that Escalante-Orozco had the onset of mild mental retardation before age eighteen on the fact that he did not progress in school, despite the extra help given him by his teacher, and that everyone noted his difficulties with reading, writing, and math. While this evidence shows Escalante-Orozco's significant deficit in functional academic skills before age eighteen, it does not demonstrate a significant impairment in adaptive functioning before that age. And although Dr. Gomez identified risk factors for a mild intellectual disability (for example, malnutrition and lack of stimulation), he did not say that these factors actually impaired Escalante-Orozco's adaptive functioning or otherwise caused an intellectual disability.

¶168  Escalante-Orozco points to a childhood neighbor's description of him as not "normal," "kind of lost," and "daydreaming" when at play as evidence of a significant impairment of adaptive functioning in childhood. In light of the many people who described Escalante-Orozco as a normal, social child, we are not persuaded by this contrary description to conclude otherwise.

¶169  In sum, Escalante-Orozco failed to show he had significantly impaired adaptive functioning before age eighteen. Consequently, he did not prove that he has an intellectual disability, and the Eighth Amendment does not bar imposition of the death penalty.

## B.  Aggravating circumstances

¶170  The jury found that Escalante-Orozco murdered Maria in an especially cruel manner. A.R.S. § 13-751(F)(6). Escalante-Orozco argues that the State failed to prove the (F)(6) aggravating circumstance, emphasizing that there were no witnesses able to testify about what happened and postulating that the killer could have approached Maria silently to slash her neck, thereby rendering her immediately unconscious. He also contends that because of his "mental impairments and his statement that he 'blacked out' after drinking two beers and woke up in [the victim's apartment] without knowing how he got there," the State failed to prove that Escalante-Orozco knew or should have known that Maria was suffering as he stabbed her.

¶171    To decide whether the State proved the (F)(6) circumstance, we review "[t]he entire murder transaction," not simply the final act that killed the victim. *State v. McCray*, 218 Ariz. 252, 259 ¶ 31, 183 P.3d 503, 510 (2008). "Mental anguish includes a victim's uncertainty about her ultimate fate." *State v. Hargrave*, 225 Ariz. 1, 17 ¶ 70, 234 P.3d 569, 585 (2010) (internal quotation omitted). Evidence of a victim's defensive injuries can establish mental pain. *Naranjo*, 234 Ariz. at 249 ¶ 83, 321 P.3d at 414. Furthermore, the victim is not required to be conscious for every wound inflicted and the victim's suffering is not required to last for any specific period of time. *Id*. This Court held in *State v. Herrera* that a period of suffering from eighteen seconds to two to three minutes can be enough to warrant application of the cruelty aggravator. 176 Ariz. 21, 34, 859 P.2d 131, 144 (1993).

¶172    The evidence established beyond a reasonable doubt that Maria consciously suffered both physical pain and mental anguish, and that Escalante-Orozco knew or should have known she was suffering. As previously related, Dr. Ross testified that it could have taken up to an hour for Maria to die. There is no testimony from Dr. Ross that the wound would have immediately killed Maria or rendered her unconscious. Indeed, he said she would have had to lose a significant amount of blood before her fatal neck wound would have caused unconsciousness, and she would have had "purposeful movement" anywhere from several minutes to almost an hour after Escalante-Orozco inflicted that wound.

¶173    Dr. Ross's testimony about Maria's other wounds also supports an (F)(6) finding. Maria suffered fourteen stab wounds on her face, neck, left shoulder, arms, and hands, many of which Dr. Ross described as antemortem (before death), non-fatal, and defensive. She also had bruises on her face; areas of bleeding—potentially hemorrhages—on her scalp; and scrape marks on her arms and legs. Dr. Ross stated that several of these injuries were consistent with defensive wounds, including several of the stab wounds on Maria's forearm, left palm, and right wrist, and a laceration on her tongue likely caused by her biting it. As previously recounted, Maria also had lacerations in her genital area. Her left-hand fingernail clippings bore a mixture of blood consistent with a combination of her blood and Escalante-Orozco's, which indicates she fought him.

¶174    Detective Jack Ballentine, one of the crime scene investigators, testified that a large blood clot in Maria's apartment was likely from her

coughing up the heavy accumulation of blood that had pooled in her lungs or throat after it was slashed. He testified that blood spatter on the walls and carpet was also consistent with coughing up blood. He further testified that the crime scene evidenced a struggle and "movement where that blood was then being transferred to the wall – across the carpet." Chunks of Maria's hair were scattered throughout her apartment, which also indicates a struggle.

¶175    Escalante-Orozco asserts that because Dr. Ross could not establish the order in which Escalante-Orozco inflicted Maria's wounds or the specific amount of time she suffered, her murder was not especially cruel. We rejected a similar argument in *State v. Cañez*, 202 Ariz. 133, 161 ¶ 104, 42 P.3d 564, 592 (2002), *abrogated on other grounds by State v. Valenzuela*, 239 Ariz. 299, 302–03 ¶ 11 n.1, 371 P.3d 627, 630–31 (2016), and do so again. The evidence of defensive wounds and a struggle proved that Maria was not immediately rendered unconscious by Escalante-Orozco's attack.

¶176    Collectively, this evidence proves beyond a reasonable doubt that Maria suffered physical pain and mental anguish for a significant period of time, likely more than the eighteen seconds to two to three minutes that was sufficient to support the especial cruelty finding in *State v. Herrera*. 176 Ariz. at 34, 859 P.2d at 144.

¶177    The State also proved that Escalante-Orozco knew or should have known of Maria's physical pain and mental anguish before she died. The violence and duration of the struggle suggest Escalante-Orozco possessed this knowledge. *Cf. Benson*, 232 Ariz. at 464 ¶ 47, 307 P.3d at 31 ("Because [the defendant] witnessed the injuries and [the victim's] conscious struggles, he knew or should have known that [the victim] suffered pain and mental anguish."). The evidence also suggests that Escalante-Orozco attacked Maria from the front so, contrary to his current supposition, he knew she saw her attacker.

¶178    This case is unlike *Moody*, in which we concluded that a reasonable jury may not have been persuaded that Moody knew or should have known that his victims suffered because he suffered from a "dissociated state" caused by psychosis or drug impairment. 208 Ariz. at 472 ¶ 226, 94 P.3d at 1167. No expert opined that Escalante-Orozco's cognitive functioning was at such a low or impaired level that he could not

understand physical and mental pain. Because the evidence suggests that Escalante-Orozco possessed awareness of his actions—for example, he quickly formulated a plan to run from authorities—we reject his argument.

¶179 Finally, finding the (F)(6) especial cruelty circumstance here aligns with other cases decided by this Court. *See Boyston*, 231 Ariz. at 555 ¶¶ 83–84, 298 P.3d at 903 (The (F)(6) aggravator was proven where (1) the victim had nine stab wounds and abrasions on several parts of the body; (2) the medical examiner testified that stab wound to the pericardium and heart wound likely would have been "fatal within a few seconds to minutes, but could possibly have taken up to twenty minutes to cause . . . death, depending on how quickly he lost blood"; and (3) the victim was heard screaming.); *State v. Kuhs*, 223 Ariz. 376, 388, 224 P.3d 192, 204 (2010) (The (F)(6) aggravator was found where defendant stabbed his victim several times and the victim ultimately died by bleeding to death while choking on his own blood.).

¶180 For these reasons, the State proved the (F)(6) aggravating circumstance beyond a reasonable doubt.

### C. Propriety of death sentence

¶181 A death sentence is appropriate if mitigating circumstances are insufficiently substantial to call for leniency. A.R.S. § 13-751(E). To make this determination, we consider the quality and strength of aggravating and mitigating circumstances, and not their number. *See Prince*, 226 Ariz. at 539 ¶ 94, 250 P.3d at 1168. "[W]e do not require a nexus between the mitigating factors and the crime, [but] the defendant's failure to establish a causal connection 'may be considered in assessing the quality and strength of the mitigation evidence.'" *Id.* (quoting *Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849).

¶182 Escalante-Orozco was required to prove any mitigating circumstances by a preponderance of the evidence. A.R.S. § 13-751(C). He argues he did so by introducing evidence of an intellectual disability, his impoverished childhood, and physical abuse by his father.

¶183 Escalante-Orozco's significantly subaverage intellectual functioning and his extremely underprivileged childhood are non-statutory mitigating circumstances. *See* A.R.S. § 13-751(G) (listing statutory

mitigating circumstances). The family lived in over-crowded conditions, worked hard, and continuously labored under the threat of going hungry. For example, the family typically ate once a day, primarily eating beans, potatoes, and tortillas. Escalante-Orozco's father "was strict, ill tempered," and would discipline his children by hitting them with a switch, belt, or other object. Escalante-Orozco's low IQ and lack of formal education exacerbated his poor start in life. But Escalante-Orozco did not establish a connection between his intellectual functioning level and poor upbringing and the crimes, and so we give these circumstances little weight. *See Prince*, 226 Ariz. at 543 ¶¶ 119–20, 250 P.3d at 1172. His underprivileged background is made even less weighty by the fact that he was twenty-six at the time of the murder and had long lived away from his family. *Cf. id.* at 541–42 ¶¶ 109–11, 250 P.3d at 1170–71 (giving little weight to a very difficult childhood that included abuse and poverty when defendant failed to establish a connection between difficult childhood and the murder).

**¶184** The mitigating circumstances are not sufficiently substantial to warrant leniency. This was a brutal crime, ample evidence supported the jury's finding that the murder was cruel, and none of the mitigating circumstances are weighty.

### D. Other Constitutional Claims

**¶185** Escalante-Orozco lists twenty-nine other constitutional claims that he acknowledges this Court has previously rejected but that he seeks to preserve for federal review. We decline to revisit these claims.

### CONCLUSION

**¶186** We affirm Escalante-Orozco's convictions and non-death sentences. In light of the United States Supreme Court's opinion in *Lynch*, we reverse the death sentence and remand for a new penalty phase proceeding.