NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JODI ANN ARIAS, *Appellant.*

No. 1 CA-CR 15-0302
FILED 3-24-2020

Appeal from the Superior Court in Maricopa County
No. CR 2008-031021-001
The Honorable Sherry K. Stephens, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist III
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Margaret M. Green, Cory Engle
*Counsel for Appellant*

Adams & Clark PC, Phoenix
By Karen A. Clark
*Special Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Kenton D. Jones and Judge Michael J. Brown joined.

---

**C A M P B E L L**, Judge:

¶1        Jodi Arias appeals her conviction and sentence for first degree premeditated murder.[1] She argues the superior court erred by (1) denying her *Batson* challenge, (2) authorizing the use of physical restraints during the trial, (3) admitting hearsay, and (4) allowing a state's expert witness to opine about her mental state during the commission of the crime. We disagree and affirm.

**DISCUSSION**

**I.        Denial of *Batson* Challenge**

¶2        Arguing the superior court improperly denied her *Batson* challenge, Arias contends the prosecutor engaged in purposeful discrimination by exercising six peremptory strikes to remove women from the venire panel. *See Batson v. Kentucky*, 476 U.S. 79 (1986).

¶3        Use of peremptory strikes to exclude potential jurors solely based upon race, gender, or some other protected characteristic violates the Equal Protection Clause of the Fourteenth Amendment. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019); *State v. Lucas*, 199 Ariz. 366, 368, ¶ 7 (App. 2001). Because the superior court is in the best position to assess a prosecutor's credibility, which is the primary factor in evaluating the State's motive for exercising a peremptory strike, we extend great deference to the court's ruling and will uphold the denial of a *Batson* challenge absent clear error. *State v. Newell*, 212 Ariz. 389, 400–01, ¶¶ 52, 54 (2006).

¶4        "To successfully challenge a peremptory strike, a party must set forth a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory

---

[1]        In a separate opinion, *State v. Arias*, 1 CA-CR 15-0302, filed simultaneously with this memorandum decision, we reject Arias' arguments relating to trial publicity and prosecutorial misconduct. *See* Ariz. R. Sup. Ct. 111(h); Ariz. R. Crim. P. 31.19.

purpose." *State v. Paleo*, 200 Ariz. 42, 43, ¶ 6 (2001) (internal quotation omitted). "The burden of production then shifts to the opponent who must explain adequately the . . . exclusion." *Id.* (internal quotation omitted). "The court then evaluates the facts to determine whether a party engaged in purposeful discrimination." *Id.* "Throughout the process, the burden of persuasion remains on the party alleging discrimination." *Id.*

¶5            At the outset of the jury selection process, the prospective jurors were sworn and introduced to superior court staff, counsel, and Arias. They were each given a questionnaire, instructed upon how to fill it out, and admonished not to discuss or research the case. After the attorneys and judge reviewed the completed questionnaires and certain venire persons were stricken for cause based solely upon their written responses, counsel conducted individual voir dire of the remaining prospective jurors.

¶6            Before the jury was empaneled, defense counsel objected to the State's use of peremptory strikes to remove Juror Nos. 9, 23, 60, 79, 112, and 154, arguing the prosecutor's motivation in exercising those strikes was gender discrimination. The prosecutor provided non-gender related reasons for each strike, and the superior court found that defense counsel had failed to prove purposeful discrimination.

¶7            On appeal, Arias again asserts that the prosecutor's exercise of six out of eight peremptory strikes to remove women from the jury was motivated by gender discrimination. Without expressly finding that Arias had made a sufficient prima facie showing of gender discrimination, the superior court asked the prosecutor to state his basis for each strike. By asking this question, the court implicitly found Arias had met her initial burden, satisfying the first step of the *Batson* analysis. *See State v. Bustamante*, 229 Ariz. 256, 261, ¶ 16 (App. 2012).

¶8            For Juror No. 9, the prosecutor cited the juror's personal history of unreported domestic violence and sexual abuse. In addition, the prosecutor expressed concern that Juror No. 9 had stated she did not "believe in the death penalty unless" there was "no other way to protect society." Given this response, the prosecutor characterized Juror No. 9 as either a "disbeliever" or a "very tepid believer" in the death penalty.

¶9            Next, the prosecutor noted that Juror No. 23 stated on her questionnaire that she would require complete certainty of guilt, "beyond any doubt," before imposing the death penalty. When questioned about this statement during individual voir dire, Juror No. 23 answered that she

required "98 percent" certainty rather than "100 percent certainty," a response the prosecutor found evinced a "cavalier attitude."

¶10 Turning to Juror No. 60, the prosecutor explained that the juror had been involved in a mutual domestic violence incident that ended in her arrest. In addition, the juror reported on her questionnaire that she felt constrained by her "religious beliefs" and did not feel comfortable imposing the death penalty.

¶11 With respect to Juror No. 79, the prosecutor cited her statement that she would consider imposing the death penalty but would vote for life imprisonment if it appeared the defendant had been "pushed over the edge." In addition, the prosecutor cited the prospective juror's husband's occupation as a "storefront preacher," stating that he found "the beliefs of somebody like that" quite "suspect."

¶12 For Juror No. 112, the prosecutor noted that she had considerable personal experience with violence. In her questionnaire, the juror reported that she had obtained a restraining order against a former boyfriend after he became physically abusive. When questioned about her other reported experiences with violence, Juror No. 112 confirmed that another former boyfriend had been murdered and a third former boyfriend had been convicted of murder.

¶13 Finally, as to Juror No. 154, the prosecutor explained that the juror had stated on her questionnaire that she believed the death penalty was akin to murder. According to the prosecutor, the juror attempted to "deflect" when asked about that response, and the prosecutor perceived from her facial expressions and body language that she was "very unhappy" and "negative" about being questioned on the matter.

¶14 Arias first argues that the prosecutor intentionally mischaracterized the voir dire responses of Juror Nos. 9, 23, and 154. She asserts that his proffered reasons were pretextual and "merely a guise for his deliberate strategy to keep women off the jury." Although defense counsel attempted to rehabilitate the jurors during individual voir dire by asking questions to allow them to temper some of their questionnaire responses, the record does not reflect the prosecutor materially misrepresented the jurors' statements about the death penalty. With respect to Juror No. 9, Arias correctly points out that the juror stated she could follow the law and vote for the death penalty if it was mandated by the evidence, but she also stated that she did not believe in the death penalty "unless there is no other way to protect society." Because the latter

statement reflects considerable reluctance to impose the death penalty, the prosecutor's characterization of Juror No. 9 as only a "tepid believer" in the death penalty was not unreasonable. Akin to Juror No. 9, Juror No. 23 avowed she could follow the court's instructions, but also stated on her questionnaire that she would not vote for the death penalty unless the State proved guilt "beyond any doubt." During individual voir dire, Juror No. 23 moderated her stance somewhat and stated she would require only 98 percent proof rather than 100 percent certainty, but the prosecutor perceived this response as "cavalier" and, considering the juror's responses in their entirety, the prosecutor's concern that she would apply an incorrect legal standard was not unfounded. Likewise, when questioned during individual voir dire, Juror No. 154 stated that she could consider imposing the death penalty, but she expressed a different view on her questionnaire, stating the death penalty was akin to murder and objecting to it upon religious grounds. Given Juror No. 154's written statements, the prosecutor's contention that she expressed reticence to impose the death penalty was not a mischaracterization.

¶15    Because each of the challenged jurors, at least initially, expressed considerable reservation about imposing the death penalty, the prosecutor was justified in exercising peremptory strikes to exclude them. *See State v. Escalante-Orozco*, 241 Ariz. 254, 271, ¶ 36 (2017) (upholding a strike based upon perceived "opposition to the death penalty or potential reluctance in imposing the death penalty if warranted"), *abrogated on other grounds by State v. Escalante*, 245 Ariz. 135 (2018); *Newell*, 212 Ariz. at 401–02, ¶¶ 55–58 (finding the prosecutor was not motivated by purposeful discrimination in striking a juror who initially stated she could not vote for the death penalty but later stated she could follow the court's instructions and vote for the death penalty because these "contradictory responses" justified a strike upon a non-discriminatory basis); *State v. Bolton*, 182 Ariz. 290, 302 (1995) (holding *Batson* permits prosecutors to strike jurors "who have expressed reservations about capital punishment" even if they are "not excludable for cause").

¶16    Second, Arias argues the prosecutor's failure to ask Jurors 9, 60, and 112 more detailed and probing voir dire questions regarding their reported domestic violence and abuse demonstrates a discriminatory intent to exclude women from the jury. To support this claim, she cites *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005), but that case is inapposite. In *Miller El*, the prosecutor's proffered race-neutral reasons clearly "mischaracterized" the prospective juror's testimony, and the prosecutor expressed no similar concern for similarly situated "white panel members." *Id*. at 244–47. Here, the prosecutor did not mischaracterize the jurors' statements, and Arias did

not identify any similarly situated males on the panel.[2] Moreover, given Arias' defense and that issues regarding domestic violence and abuse would feature prominently at trial, the prosecutor's belief that jurors' personal experience with domestic violence and abuse might improperly influence the verdict was neither unreasonable nor evidence of discriminatory intent.

**¶17**         Third, Arias contends that one of the prosecutor's proffered reasons for striking Juror No. 154, her body language and facial expressions, is not supported by the record.[3] Although Arias is correct that the transcripts do not convey the juror's bearing, the record reflects that neither the court nor defense counsel contradicted or objected to the prosecutor's characterization of Juror No. 154's demeanor. Because a prosecutor may permissibly exercise a peremptory strike to remove a

---

[2]         In her reply brief, Arias raises a comparative-analysis *Batson* challenge for the first time. She asserts that a male juror, Juror No. 144, reported on his questionnaire that he had been the victim of domestic violence, yet the prosecutor did not strike him from the venire panel. Likewise, she argues male jurors who reported misgivings about the death penalty on their questionnaires were not asked about those beliefs. Because Arias failed to raise these claims in the superior court or in her opening brief, we do not address them. *See Escalante-Orozco*, 241 Ariz. at 272, ¶ 37 (holding the defendant waived any *Batson* claim predicated on a cross-comparison analysis because he failed to raise the issue in the superior court: "[T]he prosecutor had no opportunity to offer distinctions between allegedly similarly situated jurors or to clarify which factors were given more weight in the choice to strike, and the [superior] court did not have an opportunity to conduct an in-depth comparison of the jurors who were stricken and those who remained on the panel.") (internal quotation omitted), *abrogated on other grounds by Escalante*, 245 Ariz. at 140, ¶ 15; *see also State v. Lefevre*, 193 Ariz. 385, 389, ¶ 15 (App. 1998) ("Normally, failure to raise a claim at trial waives appellate review of that claim, even if the alleged error is of constitutional dimension."); *State v. Guytan*, 192 Ariz. 514, 520, ¶ 15 (App. 1998) (holding issues raised for the first time in a reply brief are waived).

[3]         Arguably, Arias abandons this claim in her reply brief, stating that the prosecutor only proffered this reason in response to a race-based *Batson* challenge raised at trial but not pressed on appeal, not the gender-based *Batson* challenge. The record clearly reflects, however, that the prosecutor incorporated his race-neutral reasons for striking Juror No. 154 into his gender-neutral reasons for striking the juror.

prospective juror who appears hostile or evasive, the prosecutor's proffered reason does not necessarily suggest a discriminatory intent. *See State v. Hernandez*, 170 Ariz. 301, 305 (App. 1991) (noting the superior court "is in a position to observe matters that cannot be captured by a written appellate record" and holding a prosecutor may exercise peremptory selections based upon factors that "reflect attitude," including facial expressions); *see also Bustamante*, 229 Ariz. at 261, ¶ 17 (explaining a defendant waived any claim that a proffered reason was merely pretext for racial discrimination when he failed to timely object to the prosecutor's characterization of the prospective witness).

**¶18**         Fourth, Arias contends the prosecutor struck Juror No. 79 for an improper, gender-based reason. Contrary to this claim, however, the record reflects the prosecutor struck Juror No. 79 because of her reservations about the death penalty and her husband's occupation as a "storefront preacher." Neither reason gives rise to an inference of gender discrimination.

**¶19**         Finally, Arias argues the superior court failed to determine whether she had established purposeful discrimination on the part of the prosecutor; the last step of the *Batson* analysis. The record reflects, however, that in evaluating the prosecutor's proffered reasons, the court explicitly found the State had provided gender-neutral reasons for exercising each strike and defense counsel had failed to demonstrate purposeful discrimination. Because defense counsel offered no counter to the prosecutor's explanations other than to contend the prosecutor had failed to prove gender-neutral reasons for his strikes, and there is no basis upon this record to conclude the prosecutor's gender-neutral reasons for the strikes were pretextual, the superior court did not clearly err by finding the State's peremptory strikes did not violate *Batson*.

## II.     Use of Physical Restraints During Trial

**¶20**         Arias contends the superior court improperly authorized the use of physical restraints—a stun belt and a leg brace—in the presence of the jury throughout trial without first evaluating whether the State had a compelling purpose to physically restrain her. Because Arias did not object upon this basis in the superior court, we review this claim only for fundamental, prejudicial error. *See Escalante*, 245 Ariz. at 140, ¶ 12; *State v. Dixon*, 226 Ariz. 545, 551, ¶¶ 23–24 (2011) (holding a defendant waives any objection to physical restraints at trial by failing to raise the issue in the superior court).

¶21        On day 12 of trial, defense counsel approached the bench after the jurors exited the courtroom and informed the superior court that the stun belt Arias wore under her clothing was ill-fitting and difficult to conceal. Weighing in, the prosecutor stated that the jurors could not see the belt because Arias was always seated when the jury was in the courtroom. Without disagreeing with the prosecutor's assessment, defense counsel complained the belt was nonetheless burdensome and necessarily required that Arias be "very careful" with her movements. At that point, the court directly and specifically asked defense counsel whether he objected to Arias having to wear physical restraints or only the size and fit of the particular device she was required to wear. Defense counsel stated he objected only to the ill-fitting size of the belt, and the court responded that it would notify the sheriff's office of the complaint.

¶22        This issue did not resurface until Arias testified weeks later. During her direct testimony, Arias explained that she retrieved a gun from the victim's closet and accidentally shot him when he lunged at her. On cross-examination, the prosecutor questioned Arias at length regarding her account and asked that she describe the victim's threatening stance and movements in detail. Arias responded that she did not know how else to describe it and would prefer not to "act it out." Notwithstanding her express reticence, the prosecutor pressed Arias to show the jury how the victim had crouched down and leapt at her.

¶23        At that point, defense counsel approached the bench, explained that Arias could not comply with the prosecutor's request without revealing the stun belt, and argued that the prosecutor had intentionally invited Arias to participate in the demonstration to prejudice her before the jury. After clearing the courtroom, the court had Arias practice the demonstration. When defense counsel pointed out the stun belt and leg brace were both visible when Arias stepped down from the witness stand, the court directed a detention officer to remove Arias' security restraints. In response, the prosecutor withdrew his request to have Arias perform the demonstration, but defense counsel argued Arias would be prejudiced if she did not proceed with the demonstration because the prosecutor had already "called her out." When the detention officer informed the court that he could remove the restraints, the prosecutor rescinded his withdrawal and Arias performed the demonstration before the jury without physical restraints.

¶24        Although matters of courtroom security are generally left to the discretion of the superior court, "courts cannot routinely place defendants in shackles or other physical restraints *visible to the jury*." *Dixon*,

226 Ariz. at 551, ¶ 22 (quoting *Deck v. Missouri*, 544 U.S. 622, 633 (2005)). Indeed, "[b]efore authorizing visible restraints," a court must determine that the defendant presents special security concerns justifying the use of such measures, independent of any "prosecutor's request, a sheriff's department's policy, or security personnel's preference." *Id.* at 551, ¶ 25. Nonetheless, the imposition of physical restraints without the requisite independent judicial determination constitutes reversible error "only if [the] restraints are 'visible to the jury.'" *Id.* at 552, ¶ 27 (quoting *Deck*, 544 U.S. at 633).

¶25        By Arias' own admission, the parties did not address the use of physical restraints before trial and nothing in the record supports an inference that any juror ever saw the stun belt or the leg brace. Therefore, the superior court did not err, much less commit fundamental error, by failing to sua sponte inquire about the need for restraints.

¶26        Nonetheless, Arias contends the physical restraints infringed upon her right to a fair trial because they: (1) undermined the dignity and decorum of the courtroom and (2) caused anxiety that impeded her ability to fully participate in her defense at trial. In addition, Arias asserts that the prosecutor, by intentionally inviting her to step down from the witness stand and expose the stun belt and leg brace, attempted to prejudice her in front of the jury.

¶27        First, contrary to Arias' claim, nothing in the record suggests the restraints compromised the dignity and decorum of the courtroom. Rather, the record supports a finding that the physical restraints were entirely concealed from the jury's view and wholly undetected throughout the trial.

¶28        Second, although Arias claims the stun belt "extracted an undecipherable toll on her" that hindered her ability to participate in the trial and assist counsel in her defense, nothing in the record supports this claim. To the contrary, the record reflects that Arias participated significantly during the trial, testifying for 18 days. And, contrary to defense counsel's claims, Arias' "smirking" and "memory problems" during her trial testimony cannot reasonably be attributed to the stun belt because they were entirely consistent with her pretrial behavior and the theory of her defense (dissociative amnesia).

¶29        Finally, even assuming the prosecutor acted in bad faith by inviting Arias to provide a physical demonstration of the victim's posture and movements, intending to thereby reveal the physical restraints, Arias

sustained no resulting prejudice.[4] After the invitation was extended, defense counsel immediately objected, and the court prompted the attending detention officer to remove the restraints before the prosecutor proceeded with the demonstration. Therefore, upon this record, Arias sustained no prejudice from the use of physical restraints at trial.

### III.    Admission of Hearsay

**¶30**        Citing the Arizona Rules of Evidence and the Confrontation Clause, Arias contends the superior court improperly permitted a police officer to recount out-of-court statements uttered by her grandparents.

**¶31**        A few days before trial commenced, Arias moved to preclude the State from introducing "any evidence related" to the gun theft from her grandparents' home, contending each of her grandparents' statements to Officer Kevin Friedman, who investigated the burglary, constituted inadmissible hearsay. In its response, the State did not address the grandparents' statements, but argued evidence of the burglary was admissible because Arias admitted to police that her grandparents' gun had been reported stolen. In her reply, Arias countered that she had never acknowledged the *type* of gun stolen from her grandparents' home, claiming an interrogating detective had "fed that information" to her.

**¶32**        After oral argument, the superior court denied the motion to preclude, finding that Arias' statements to the detective regarding the stolen gun were admissible as statements of an opposing party under Arizona Rule of Evidence 801(d)(2). Notwithstanding Arias' framing of the issue, the court did not address whether Officer Friedman could recount statements that Arias' grandparents had made during the burglary investigation.

**¶33**        At trial, Officer Friedman testified that he responded to a reported burglary at Arias' grandparents' residence. As part of his investigation, he spoke with Arias' grandparents, who reported a missing firearm. When the prosecutor then asked the officer to restate "what item was involved in th[e] burglary," defense counsel objected on hearsay grounds. At the bench, defense counsel reasserted his objection and the prosecutor countered that he was not offering the evidence for its truth, that is, not to show what was actually stolen, but to demonstrate what the officer

---

[4]        Although the State asserts that Arias "initially offered to demonstrate" the pose, the record reflects otherwise.

believed and recorded in his report. Finding the prosecutor did not elicit hearsay, the court overruled defense counsel's objection.

¶34          Nonetheless, the bench conference continued, and the prosecutor told the court he would call the detective who interrogated Arias, Detective Esteban Flores, later that afternoon, avowing the detective would testify that Arias admitted "that a .25 caliber gun was [reported] missing" during her interrogation. In response, defense counsel restated his hearsay objection, arguing the interrogating detective raised the issue of the gun with Arias, and she "never said anything" about it. Accepting the prosecutor's avowal that he would later corroborate the gun theft statement, the court permitted Officer Friedman to testify that a .25 caliber handgun had been reported missing.

¶35          After Officer Friedman concluded his testimony, the State called Detective Flores to the stand. When questioned about his interview with Arias, Detective Flores testified that he asked her about the alleged theft of her grandparents' .25 caliber handgun. The State then played those portions of Arias' recorded police interview, and the court admitted the exhibits into evidence.

¶36          During her subsequent testimony, Arias denied stealing her grandparents' .25 caliber handgun. She admitted, however, that she knew the gun had been reported stolen before her police interrogation.

¶37          We generally review a superior court's evidentiary rulings for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006). "Evidentiary rulings that implicate the Confrontation Clause, however, are reviewed de novo." *Id.*

¶38          In general, out-of-court statements offered to prove the truth of the matter asserted are inadmissible unless grounded in a hearsay exception. Ariz. R. Evid. 801(c); 802. Testimonial hearsay, which includes statements given in response to formal police questioning, is barred also by the Confrontation Clause when the declarant does not appear at trial, unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 53 n.4, 59 (2004). For these reasons, out-of-court statements contained in a police report are hearsay and inadmissible absent a qualifying exception. *State v. Smith*, 215 Ariz. 221, 229, ¶¶ 27–28 (2007); *see also Ritchie v. Krasner*, 221 Ariz. 288, 302, ¶ 45 (App. 2009) (explaining that police reports are properly excluded as hearsay). As a corollary, a police officer's "hearsay recollections" of a written report are equivalent to offering the report into

evidence and are therefore inadmissible. *State v. Seymour*, 21 Ariz. App. 144, 146 (1973).

**¶39**        Contrary to the superior court's finding, the record clearly reflects that the prosecutor sought to introduce the grandparents' statements, through Officer Friedman, to prove their truth. That is, the prosecutor intended to use the out-of-court statements to demonstrate that the grandparents believed that: (1) they had been the victims of a home invasion, and (2) their .25 caliber handgun had been stolen. Although the prosecutor avowed that he sought only to introduce evidence of Officer Friedman's beliefs, this claim is belied by the record. While Officer Friedman's beliefs were wholly irrelevant to the case, the grandparents' beliefs about the apparent burglary and gun theft featured prominently in the State's theory of the case. Indeed, the prosecutor argued extensively in closing that Arias had staged a burglary of her grandparents' home so she could procure a gun to kill the victim.

**¶40**        While Officer Friedman did not recite a direct out-of-court statement during his testimony, he indirectly recounted the substance of Arias' grandparents' statements. Because those statements do not fit within any of the recognized exceptions to the rule against hearsay, and there is no basis upon this record to conclude the grandparents were unavailable to testify or that Arias had a previous opportunity to cross-examine them, evidence of their statements to Officer Friedman constituted testimonial hearsay violating both the Arizona Rules of Evidence and the Confrontation Clause.[5]

---

[5]        Citing *United States v. Davis*, 154 F.3d 772 (8th Cir. 1998), the State contends that Officer Friedman's testimony was admissible to rebut defense counsel's claim that Arias "never said anything . . . about the gun." Contrary to the State's argument, *Davis* does not stand for the proposition that a prosecutor may introduce otherwise inadmissible testimonial hearsay in anticipation that defense counsel may challenge a police investigation. In *Davis*, the defense attorney attacked the government's criminal investigation as defective during opening statements, so the introduction of certain challenged testimony served the non-hearsay purpose of rebutting that attack. 154 F.3d at 778–79. Unlike *Davis*, here, defense counsel did not call into question the propriety of the police investigation before the jury. Instead, while discussing the basis of his objection to Officer Friedman's testimony at the bench, defense counsel

¶41        Improperly admitted testimonial hearsay is subject to harmless error review. *State v. Bass*, 198 Ariz. 571, 582, ¶ 45 (2000); *State v. Parks*, 211 Ariz. 19, 31, ¶ 54 (App. 2005). The State bears the burden of showing that beyond a reasonable doubt the jury's verdict was "surely unattributable to the error." *State v. Anthony*, 218 Ariz. 439, 446, ¶ 39 (2008) (internal quotation omitted). To satisfy this standard, the record must contain "a body of proof, firmly convincing on the essential facts," such that the jury would have convicted even without the error. *Bass*, 198 Ariz. at 582, ¶ 45. In evaluating whether a testimonial hearsay error is harmless, we consider several factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

¶42        Applying this standard here, the erroneous admission of Officer Friedman's testimony about the gun theft was harmless. Evidence of the apparent burglary and gun theft was corroborated by Detective Flores' testimony and, more importantly, the interrogation recordings that were admitted as exhibits, which allowed the jurors to directly assess Arias' admissions. Moreover, Arias testified unequivocally that she knew, before her interrogation, that her grandparents had reported their gun stolen. Given Arias' repeated and express admissions that she knew, before her interrogation, that her grandparents had reported their gun stolen as part of an apparent burglary, the erroneous admission of Officer Friedman's testimony was cumulative and therefore harmless beyond a reasonable doubt. *See State v. Weatherbee*, 158 Ariz. 303, 305 (App. 1988) (explaining the erroneous admission of hearsay evidence is harmless when the improperly admitted hearsay is "entirely cumulative").

## IV.    Admission of Expert Testimony

¶43        Arias contends the superior court improperly permitted a State expert witness to testify regarding Arias' mental state during the commission of the crime, a requisite element of the offense.

---

argued that Detective Flores, not Arias, brought up the gun during the police interrogation. Therefore, the State's reliance upon *Davis* is misplaced.

¶44        We review a superior court's admission of expert testimony for an abuse of discretion. *State v. Sosnowicz*, 229 Ariz. 90, 94, ¶ 15 (App. 2012). In doing so, we view "the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *State v. Ortiz*, 238 Ariz. 329, 333, ¶ 5 (App. 2015) (internal quotation omitted).

¶45        At trial, Arias testified she shot the victim when he lunged at her, but claimed she had no memory of the events that followed other than a vague recollection of dropping a bloody knife on the victim's tile floor. In support of this account, a defense expert, Dr. Richard Samuels, testified that Arias suffers from post-traumatic stress disorder and lacks memory of the killing because she was operating in a state of fight or flight, brought on by fear for her life.

¶46        In rebuttal, the State called Dr. Janeen DeMarte to address Arias' alleged memory loss. When the prosecutor asked Dr. DeMarte whether Arias exhibited any "higher order behaviors" after she killed the victim, defense counsel objected, arguing the question impermissibly asked Dr. DeMarte to opine on Arias' mental state at the time of the offense. In response, the prosecutor argued that he simply intended to elicit testimony relevant to Arias' memory. Overruling the objection, the superior court stated that defense counsel could address the matter on cross-examination and possibly would be permitted a surrebuttal. Once direct questioning resumed, Dr. DeMarte testified that Arias' deletion of photos and her effort to clean the crime scene demonstrated organization and planning after the killing. Defense counsel reasserted his objection to no avail. Defense counsel then moved for a mistrial, arguing Dr. DeMarte's testimony about Arias' ability to plan and organize reached the ultimate issue and the only remaining element of the offense to be found by the jury—Arias' mental state at the time of the killing. Rejecting defense counsel's claim, the court denied the motion for mistrial. When questioning resumed, Dr. DeMarte testified, over objection, that Arias' act of deleting photographs reflected an organizational thought process.

¶47        Building upon Dr. DeMarte's testimony, the prosecutor argued in closing that Arias' actions after she killed the victim proved that she acted with premeditation and belied any claim she lacked "clarity of thought" during the killing. Specifically, the prosecutor referenced Arias' post-killing acts of changing her footwear, deleting photographs, putting the camera in the washing machine, cleaning the knife, taking and disposing of the gun, staging the scene, washing certain items with bleach, and leaving the victim a voicemail.

¶**48** Under Arizona Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." While expert testimony may "'embrace[] an ultimate issue' to be decided by the trier of fact if the testimony is otherwise admissible," "[w]itnesses are not permitted as experts on how juries should decide cases." *Sosnowicz*, 229 Ariz. at 95, ¶ 17 (quoting Ariz. R. Evid. 704). For this reason, an expert witness may not opine about the defendant's mental state at the time of the offense if that mental state constitutes an element of the crime or of a defense. Ariz. R. Evid. 704(b).

¶**49** Contrary to Arias' claim, Dr. DeMarte's testimony did not violate Rule 704. At trial, Arias admitted, without qualification, that she, alone, killed the victim. Given the nature of the victim's injuries, this admission left only one issue for the jury—Arias' mental state at the time of the offense. While the prosecutor argued the killing was premeditated, an intentional and knowing act preceded by a "length of time" sufficient "to permit reflection," A.R.S. § 13-1101(1), defense counsel theorized Arias lacked clarity of thought and, therefore, lacked the capacity to act with premeditation. To support the self-defense theory, Dr. Samuels testified that Arias experienced an overwhelming "fight or flight" fear response when the victim lunged at her, which prevented her from processing what transpired and resulted in dissociative amnesia. In rebuttal to this expert testimony, Dr. DeMarte opined that Arias exhibited high-order executive functioning immediately after the killing, which was inconsistent with a confused and impaired state. Although Dr. DeMarte's testimony directly contradicted Dr. Samuels' opinion, Dr. DeMarte did not testify regarding premeditation or otherwise opine Arias had clarity of thought and an opportunity to reflect *before* killing the victim. Indeed, she strictly limited her testimony to Arias' mental state and behaviors *after* the killing. *See United States v. Morales*, 108 F.3d 1031, 1041 (9th Cir. 1997) ("Rule 704(b) does not preclude expert testimony from which a jury might infer that a criminal defendant did or did not possess the requisite *mens rea*. The rule only precludes expert testimony of an opinion or inference that the defendant did not have the requisite *mens rea* and testimony of an opinion or inference which if true would compel the conclusion that the defendant did or did not have the requisite *mens rea*."). Therefore, the superior court did not abuse its discretion by admitting the expert testimony.

**CONCLUSION**

¶50        For the foregoing reasons, as well as those set forth in the separately filed opinion, we affirm Arias' conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED:   AA